CORNELIUS A. BOTTOMLEY & others[1] *vs*. DIVISION OF
ADMINISTRATIVE LAW APPEALS & another.[2]

Suffolk. December 13, 1984. — August 18, 1986.

Present: GREANEY, C.J., ARMSTRONG, & BROWN, JJ.

*Administrative Law*, Regulations, Rate setting. *Nursing Home*.

Under a regulation of the Rate Setting Commission excluding from "average
equity capital," upon which a nursing home operator was entitled to
earn a rate of return, the operator's net operating loss in the first twelve
months of operation, but limiting such loss to an amount equal to the
owner's "average annual capital investment," the commission was not
required, in determining the per diem rate at which the operators of a
nursing home would be reimbursed for publicly aided patients, to credit
the operators with their entire first twelve months' loss in computing
their average equity capital. [653-657]
There was no merit to the contention by the operators of a nursing home
that the Rate Setting Commission's method of determining a per diem
rate at which the operators would be reimbursed for publicly aided
patients did not make adequate provision for the recovery of start-up
losses that allegedly resulted from the Department of Public Health's
having licensed the facility in twenty-bed increments, instead of having
licensed the home's entire contructed bed capacity, where no showing
was made either that a causal link existed between staggered licensing
and the reimbursement penalty suffered by the nursing home's operators
due to the home's lower than standard occupancy, or that the rate-setting
methodology employed by the commission did not make provision in
some other way for the reasonably incurred costs which resulted in the
first year losses. [657-658]

CIVIL ACTION commenced in the Superior Court Department
on July 19, 1982.

The case was heard by *Mel L. Greenberg*, J., on a master's
report.

[1] James N. Plunkett and Arthur G. Stein.

[2] Rate Setting Commission.

*Kenneth A. Behar* for the plaintiffs.

*Despena Fillios Billings,* Assistant Attorney General, for Division of Administrative Law Appeals & another.

ARMSTRONG, J.   The plaintiffs, owners of a nursing home which opened July 15, 1975, appealed from the Rate Setting Commission's determination of a per diem rate at which the nursing home would be reimbursed for publicly aided patients in 1978. The plaintiffs' contention is that the commission's methodology did not make adequate provision for the recovery of start-up losses that they allege resulted from the staggered licensing procedure mandated by the Department of Public Health: that is, instead of licensing the nursing home's entire constructed bed capacity (120 beds) at the outset in 1975, the department licensed in twenty-bed increments, spreading the licensing process over a nine-month period. The start-up losses, the plaintiffs contend, resulted in some part from costs which must be incurred regardless of occupancy, such as fixed capital costs and many administrative and service salaries, and in some part from the "occupancy penalty," so called, whereby operating costs are apportioned over an assumed minimum number of patients, even though actual occupancy is lower.

The plaintiffs' argument mingles two contentions which we think are analytically distinct. The first is that the commission was required by its own regulations to credit the nursing home with its entire first twelve months' loss in computing the nursing home's "average equity capital," upon which the home was entitled to earn a rate of return.[3] The regulation in question, 114.2 Code Mass. Regs. § 2.09(6)(p) (1978), excludes from "average equity capital"

" [f]or the final rate effective January 1, 1978, the net operating loss[4] incurred in the first twelve months of operation for a facility constructed [as this nursing home

---

[3] Specifically, in 1978 the commission treated as an allowable cost a return of 10.59 percent on the owners' "average equity capital," as defined in 114.2 Code Mass. Regs. § 2.02(4) (1978).

[4] The reader should observe that the *exclusion* of a *loss* (i.e., a negative figure) from average equity capital in effect increases average equity capital.

was] since January 1, 1968. The net operating loss shall be limited to reasonable costs as determined by the [c]ommission and *for any given year may not exceed an amount equal to average annual capital investment of the owner* as determined by the [c]ommission" (emphasis supplied).

It has been agreed, for purposes of this case, that the nursing home's net operating loss incurred in the first twelve months of its operation was at least $97,220. The commission, applying the limitation expressed in the clause emphasized above, allowed only $29,036 of the start-up loss to be included in computing "average equity capital." This was the amount of the direct capital contribution of the owners in 1975, as it appeared on their 1975 Rate Setting Commission annual report form. No similar contribution was reported on the 1976 form, although the owners claim to have made a further direct capital contribution of $28,218 at an unspecified time during that year. The plaintiffs contend that the words "average annual capital investment" in the regulation require the commission to include the $28,218 contribution just mentioned as well as retained profits for the years 1976, 1977, and 1978 (which were, respectively, $27,520, $23,929, and $69,241). Recognition of those figures would give the plaintiffs (they argue) the benefit of the entire first year operating loss in the computation of "average equity capital."

The transcript of proceedings before the hearing officer shows that the disagreement as to the interpretation of § 2.09(6)(p) and, in particular, the ambiguous language emphasized in the quoted regulation, focused on two points: (1) whether retained profits should be treated as a capital investment and, thus, as the equivalent of direct cash contributions; and (2) whether capital contributions made after the twelve-month start-up period should be included. On the latter point, it is true that (as the plaintiffs argue) the words "average annual capital investment" on their face contemplate consideration of capital investments for more than a single year. It does not necessarily follow, however, that they include years beyond the start-up period, because the start-up period itself will usually

(except in the case of a nursing home which opens on the first of January) spread over two reporting years, which are calendar years. The first twelve months' allowable start-up loss is for this nursing home a composite of the net operating loss incurred in the last five and one-half months of 1975 and the net operating loss incurred in the first six and one-half months in 1976. The "capital investment," whether that term refers to the owners' total invested capital in a given period or to the owners' contributions made during that period, may be at different levels not only as between the two component years, but from day to day within each of those years taken separately.[5] The formulation is ambiguous, but in resolving the ambiguity we give deference to the commission's interpretation of its own regulation if the language thereof can reasonably be so read. *Amherst Nursing Home, Inc.* v. *Commonwealth*, 16 Mass. App. Ct. 638, 640-641 (1983). Here we cannot say that the commission would misinterpret its regulation in reading it to require that the commission determine, in some appropriate fashion, an average of the capital investments of the owners during each of the two component calendar years of the first twelve months of operation and to apply those averages to limit the net losses reported in each of those years.[6] The words "as determined by the commission" are obviously intended to give the commission some latitude in determining a proper method of striking the average.

---

[5] A commission witness testified at the hearing that an owner who makes a captial contribution on the last day of a year is credited with an average capital contribution during the year of one three hundred sixty-fifth of the amount; whereas an owner who makes the same contribution on the first day of the year will be credited with the entire amount (assuming it is not withdrawn during the year). In this case the plaintiffs have been credited with the 1975 cash contribution in full, but not with the alleged 1976 cash contribution, which was not shown to have been made within the start-up period.

[6] Under this interpretation the words "for any given year" would refer to the two component calendar years, parts of which are included in the start-up period. Under the plaintiffs' interpretation of § 2.09(6)(p), the words "for any given year" would seemingly have to be read as a reference to the average annual capital investment of the owner computed as of the year for which rates are being determined. That construction seems improbable in view of the fact that § 2.09(6)(p) by its terms only governs rates of reimbursement for the year 1978.

If the only capital investments to be considered under the regulation are those made during the start-up period, there is no need to deal with the contention that profits retained in the business should be considered as the equivalent of direct capital contributions.[7] The regulation concerns the treatment of a net operating loss in the start-up period, which precludes the existence of a net operating profit in the same period.[8]

The plaintiffs rely heavily on their accountant's testimony to the effect that he had talked with a former commission employee who claimed to have drafted § 2.09(6)(p). The draftsman's intention, according to the accountant, was to permit full credit for net operating losses of the start-up period as soon as the nursing home had achieved a positive equity position. By the end of 1978, the plaintiffs argue, they had attained a positive net investment of $57,511.[9]

On its face, however, the regulation looks not to the owners' *net* capital investment but to their *average annual* capital investment. The plaintiff would give effect to the word "annual" by

[7] In the abstract the inclusion of undistributed profits is supported by the second dictionary definition of the term "invested capital" relied on in the plaintiffs' brief: "1. The amount of capital contributed to a business by its owners; . . . 2. The amount so contributed, plus retained earnings (or less accumulated losses) and appropriated surplus." Kohler, A Dictionary For Accountants 275 (5th ed. 1975). The commission's interpretation is supported by the first definition.

[8] The plaintiffs claim to have proved that in the first half of 1976 the nursing home realized net losses on Medicaid patients but enjoyed in the same period net profits on private-pay patients of approximately $11,000. Like the commission, we see no basis in the regulation for computing net operating losses solely with respect to the Medicaid population, without offsetting operating profits from the private-pay population. Although the net operating loss figure mentioned in the text ($97,220) represented the net loss attributable to Medicaid patients, a commission witness testified that the commission would have computed a different (and larger) net loss figure based on the aggregate operating experience. The commission (and the hearing officer) did not have to determine the precise net start-up loss because in their view the application of the limiting factor (average annual capital investment) made the actual figure irrelevant.

[9] Computed by aggregating (1) the capital contribution of $29,036 in 1975, (2) the claimed capital contribution of $28,218 in 1976, and a total of $120,690 in undistributed profits earned in 1976 to 1978; and subtracting from the total $120,433 of losses in 1975.

including in the calculation the investment of years after the start-up year, but they fail to give any effect to the word "average." Where reasonably possible, no portion of the language of a regulation should be treated as surplusage. *Morin* v. *Commissioner of Pub. Welfare*, 16 Mass. App. Ct. 20, 24 (1983). Here it is neither impossible nor difficult to give effect to the word "average." Applying the straightforward meaning of the words "average annual" to the 1978 capital investment figure contended for by the plaintiffs, that figure ($57,511) would have to be divided by four (the total number of reporting years) or three and one-half (the nursing home's total period of operation expressed in years) to arrive at the "average annual capital investment" of the owners. The latter method, which is the most favorable to the plaintiffs, would produce a ceiling of $16,432, lower than the ceiling applied by the commission. The plaintiffs thus would not stand to gain, even if the years after the start-up period were included in the calculation.

The plaintiffs' other contention is that their nursing home is entitled, regardless of the actual language of the regulation to a per diem rate which will make possible a recovery of losses incurred in complying with government mandates (here, the staggered licensing procedure). This contention fails for want of a factual foundation. No attempt has been made to prove that any particular portion of the start-up losses was attributable to the staggered licensing procedure. Obviously certain costs (e.g., fixed capital costs, administrator's salary) had to be incurred well in advance of full operation; but the same is true of any starting business. We can assume that beds do not fill up overnight, and there has been no showing that the licensing process delayed the filling of beds here.

It is true that Medicaid reimbursements in 1975 were based on ninety-three percent occupancy (ninety-five percent in 1976), whether those occupancy levels were achieved or not, but that standard was applied to the licensed bed capacity at any given time, not to constructed bed capacity. Compare *Palm Manor Nursing Home, Inc.* v. *Rate Setting Commn.*, 359 Mass. 652, 656-657 (1971); *Murphy Nursing Home, Inc.* v. *Rate Setting Commn.*, 364 Mass. 454, 463-464 (1973). It is not at

all improbable that the occupancy penalty would have a less severe impact where beds come on line gradually, as they did here under staggered licensing, than if all 120 beds had come on line on July 15, 1975. Facially there has been no showing of a causal link between staggered licensing and the reimbursement penalty suffered by the plaintiffs due to the lower than standard occupancy.

Moreover, no showing has been made that the rate-setting methodology employed by the commission does not make provision in some other way for the reasonably incurred costs which resulted in the first year losses. Start-up losses are anticipated in most businesses, and provision must be made therefor either by incurring indebtedness or by contributions of capital. The rate setting methodology makes elaborate provision for reasonable debt service costs and for a reasonable return on equity capital. On the tunnel view this case gives us of one narrow facet of the rate making mechanics, we have no basis for concluding that the per diem rate fixed for the plaintiffs' nursing home for 1978 was not reasonable and fair over-all. The law does not require that fair and adequate provision be made for each particular item of reasonable cost taken separately. *Murphy Nursing Home, Inc.* v. *Rate Setting Commn.*, 364 Mass. at 462-463. Compare *Lynn* v. *Rate Setting Commn.*, 21 Mass. App. Ct. 576, 580 (1986).

*Judgment affirmed.*