JOHN MOSTYN, trustee,[1] *vs.* DEPARTMENT OF ENVIRONMENTAL
PROTECTION & others.[2]

No. 12-P-1284.

Suffolk. April 4, 2013. - June 24, 2013.

Present: MEADE, MILKEY, & HANLON, JJ.

*Real Property,* Beach, Conservation restriction. *Beach. Wetlands Protection
Act. Department of Environmental Protection. Municipal Corporations,*
Conservation commission. *Administrative Law,* Standing, Regulations,
Agency's interpretation of regulation. *Practice, Civil,* Standing.

This court did not reach the question of a plaintiff's standing to challenge a
decision of the Department of Environmental Protection, where the merits
had been fully briefed and the question of standing was not outcome
determinative. [791-792]

In a civil action challenging a decision of the Department of Environmental
Protection (department) temporarily to allow the storage of kayaks, under
specified conditions, on a coastal dune, the judge properly granted judg-
ment on the pleadings in favor of the department, where the applicable
regulation did not per se prohibit boat storage structures on coastal dunes
[792-796], and where the department, in allowing such structures, properly
determined that the applicable performance standards would be met
[796-797].

CIVIL ACTION commenced in the Superior Court Department on
July 20, 2010.

The case was heard by *Thomas E. Connolly,* J., on motions
for judgment on the pleadings.

*David L. Klebanoff* for the plaintiff.

*Suleyken D. Walker,* Assistant Attorney General, for Depart-
ment of Environmental Protection.

*Justin Perrotta* for Terry Milligan.

MILKEY, J. The Sea Pines Condominium Association (Sea
Pines) owns a lengthy stretch of beach in Brewster. On a long-

---

[1] Of the Lot 106-2 Dune Road Realty Trust.

[2] Conservation Commission of Brewster and Terry Milligan.

standing basis, members of the association have stored kayaks on a coastal dune there. Upland of the area where the kayaks were stored is property owned by the Lot 106-2 Dune Road Realty Trust, whose sole beneficiary is Joseph E. Corcoran.[3] Corcoran objects to the kayaks being stored in front of his property and the attendant foot traffic that it engenders. At his instance, the conservation commission of Brewster (commission) determined that the storage of the kayaks on the dune was an activity subject to regulation pursuant to the Wetlands Protection Act, G. L. c. 131, § 40 (the act), and therefore that it could continue only if Sea Pines obtained an order of conditions allowing such use.[4] After several layers of administrative review and an adjudicatory hearing, the Department of Environmental Protection (DEP) issued a final decision temporarily allowing the kayak storage to resume on certain specified conditions. On Corcoran's appeal taken pursuant to G. L. c. 30A, § 14, a Superior Court judge affirmed DEP's decision. We affirm the judgment.

*Background.* According to evidence presented at the adjudicatory hearing, Sea Pines has stored kayaks or other small boats on the dune since 1981. Although Corcoran contested that specific date, it appears undisputed that the practice has been of very long duration.

As DEP's presiding officer found, and Sea Pines does not dispute, the long-standing storage of the boats, and attendant foot traffic, has had an adverse impact on the dune. Specifically, the portion of the dune at issue has become "denuded of vegetation," and it is a foot or more lower in elevation than surrounding areas. In turn, the lack of vegetation and reduced height render the dune more susceptible to erosion, and this raises

---

[3]The nominal plaintiff in this case, as well as the nominal petitioner in the administrative proceedings below, is the trustee of the trust. Nevertheless, we will refer to the plaintiff as Corcoran, the real party in interest.

[4]Corcoran also filed litigation alleging that the kayak storage materially interfered with an easement he held in the beach. That litigation was resolved in Sea Pines's favor by an unpublished memorandum and order pursuant to our rule 1:28. *Mostyn* v. *Board of Managers of Sea Pines Condominium I Assn.*, 81 Mass. App. Ct. 1126 (2012). Other litigation between the parties regarding this property has reached this court on at least two prior occasions. Lending some context to the disputes is the fact that Corcoran was the principal of the company that developed Sea Pines.

concerns about the dune's ability to serve its flood control and storm damage protection functions.

Through filing what is known as a "request for determination of applicability," Corcoran formally requested that the commission determine that the kayak storage is subject to regulation under the act. The commission determined that it is, a ruling that Sea Pines accepts as correct. As all parties agree, the commission (or DEP) could have issued an enforcement order that, inter alia, sought to require Sea Pines to restore the degraded portion of the dune. See G. L. c. 131, § 40, thirty-first par., inserted by St. 1990, c. 388, § 1 (authorizing administrative enforcement orders and stating that "[a]ny person who violates the provisions of this section may be ordered to restore property to its original condition and take other actions deemed necessary to remedy such violations"). The commission chose not to pursue enforcement and instead decided to seek restoration of the dune under its permitting authority.[5]

By filing a notice of intent dated July 18, 2008, Sea Pines sought approval to resume storage of its kayaks on the dune.[6] Under its proposal, the boats would be stored on seasonally-deployed wooden racks instead of directly on the sand (the historic practice). The proposal included various measures designed to minimize adverse impacts going forward. It also included the replanting of vegetation in the area and other measures designed to accelerate restoration of the dune. It is undisputed that the "cessation of the storage of boats directly on the dune" by itself would result in the dune "eventually undergo[ing] a natural restoration." However, it is also undisputed that "the planting of dune vegetation may increase sand deposition and result in restoration of the dune more quickly."[7]

In an eighteen-page ruling issued on June 11, 2010, the presid-

---

[5]The DEP presiding officer offered her view that the commission did not pursue enforcement because "the use of the dunes for boat storage was apparently of long duration." In any event, Corcoran makes no claim that the commission (or DEP) had any duty to pursue enforcement.

[6]The notice of intent was filed by Sea Pines's president, defendant Terry Milligan. We refer to the project proponent as Sea Pines, the real party in interest.

[7]The presiding officer found that all parties agreed to these points, and no party disputes that finding on appeal.

ing officer recommended approval of Sea Pines's proposal subject to various conditions. The approval was limited in certain significant respects. Most importantly, the permission to be granted would expire after three years, and during those three years Sea Pines would have to monitor the progress of dune recovery and submit annual reports documenting that progress. The ruling also specified that, if and when Sea Pines sought approval to continue kayak storage on the dune beyond the three years, the commission or DEP

> "should review the project from the perspective of the activity proposed for the restored dune, assuming the plantings and fencing have indeed been effective . . . [and] based upon the monitoring report[s] and their observation of the site, [the commission or DEP] may determine whether or not the seasonal deployment of the kayak storage racks on the coastal dune meets the [applicable regulatory] performance standard."

On June 22, 2010, DEP's commissioner issued a final decision accepting in full the presiding officer's findings and recommendations. On Corcoran's c. 30A appeal, a Superior Court judge ruled that DEP's final decision "is supported by substantial evidence, is not arbitrary or capricious and is not otherwise based on an error[] of law for the reasons stated in [DEP's opposition]."

*Discussion.* 1. *Standing.* Sea Pines contends that Corcoran has no standing to maintain this action. It argued below that Corcoran was not a "person aggrieved" within the meaning of DEP's regulations and, therefore, had no standing to prosecute his administrative appeals.[8] The presiding officer rejected that argument, and Sea Pines has demonstrated no error in that ruling. Granted, the presiding officer specifically determined

---

[8]Under DEP's wetlands regulations, "person aggrieved" is defined as follows:

> "any person who, because of an act or failure to act by the issuing authority, may suffer an injury in fact which is different either in kind or magnitude from that suffered by the general public and which is within the scope of the interests identified in [G. L.] c. 131, § 40."

310 Code Mass. Regs. § 10.04 (2008).

that Corcoran was unable to substantiate that the project, as ultimately conditioned, would harm him.[9] However, the presiding officer expressly based that finding in part on limitations to the project that she imposed as a result of Corcoran's administrative appeals.[10]

Corcoran appears to assume that because he was a proper party to the adjudicatory proceeding, he therefore automatically has standing to appeal an adverse decision by the agency. This is not correct. See *Board of Health of Sturbridge* v. *Board of Health of Southbridge*, 461 Mass. 548, 558 & n.22 (2012). None of the parties has focused on the question whether Corcoran, having had standing before the agency, nevertheless lacked standing to bring a judicial appeal once DEP imposed its conditions.[11] Instead, the parties, like the judge, focused on the merits. Where the merits have been fully briefed and the question of standing is not outcome determinative, we decline to resolve standing and instead turn to the merits. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 805 (1975) (although the intervener's standing to appeal an administrative decision was "doubtful," the court proceeded to reach the merits where "it [made] no difference in the result").[12]

2. *Merits.* Prior to altering a wetlands resource area, one must obtain an order of conditions from the local conservation commission or DEP (respectively, the issuing authority). G. L. c. 131, § 40. The approval process serves to ensure that the interests that wetlands serve are protected. See generally *Citizens for Responsible Envtl. Mgmt.* v. *Attleboro Mall, Inc.*, 400 Mass. 658, 669 (1987). Coastal dunes serve critical interests such as

---

[9]Corcoran maintained that the project could lead to increased erosion of the coastal bank that lies between his property and the dune. The presiding officer rejected that argument.

[10]We need not address whether, under DEP's regulations, Corcoran may have standing independently as an abutter to the project site. See 310 Code Mass. Regs. § 10.05(7)(a)(3), (4) (2008); 310 Code Mass. Regs. § 10.05(7)(j)(2)(a) (2007).

[11]Indeed, DEP has not briefed the standing issue at all.

[12]Although standing in Massachusetts courts is often described as "jurisdictional," there is no absolute rule that if standing is doubtful, it must be resolved before the merits are reached. Contrast *Steel Co.* v. *Citizens for a Better Envt.*, 523 U.S. 83, 93-102 (1998) (addressing standing under art. III of the United States Constitution).

offering protection against coastal storm surges.[13] As all parties here recognize, because of the importance of these interests and the inherent fragility of this type of wetlands resource area, coastal dunes are subject to particularly stringent protections.

Alterations of coastal dunes are governed by 310 Code Mass. Regs. § 10.28 (1997). Corcoran argues that DEP's approval of Sea Pines's project is at odds with this regulation in two respects. First, he argues that the regulation per se prohibits boat storage structures on coastal dunes regardless of whether the applicable performance standards would be met. Second, Corcoran argues that even if DEP could allow such structures on coastal dunes if it properly determined that the applicable performance standards would be met, it misapplied those standards here. We address these arguments in order.

a. *Whether boat storage structures are per se prohibited on coastal dunes.* Under the applicable regulation, alterations of coastal dunes must meet six strict regulatory performance standards, as set forth in the margin.[14] See 310 Code Mass. Regs. § 10.28(3) (1997). Another subsection of the regulation lists three specific kinds of projects that "may be permitted,

---

[13]The "preamble" portion of the relevant regulation states that "[a]ll coastal dunes are likely to be significant to storm damage prevention and flood control, and all coastal dunes on barrier beaches and the coastal dune closest to the coastal beach in any area are per se significant to storm damage prevention and flood control." 310 Code Mass. Regs. § 10.28(1) (1997). After noting that "[c]oastal dunes are also often significant to the protection of wildlife habitat," the preamble goes on to explain in some detail how coastal dunes further the interests they serve. *Ibid.*

[14]The relevant subsection provides:

> "Any alteration of, or structure on, a coastal dune or within 100 feet of a coastal dune shall not have an adverse effect on the coastal dune by:
>
> "(a) affecting the ability of waves to remove sand from the dune;
>
> "(b) disturbing the vegetative cover so as to destabilize the dune;
>
> "(c) causing any modification of the dune form that would increase the potential for storm or flood damage;
>
> "(d) interfering with the landward or lateral movement of the dune;
>
> "(e) causing removal of sand from the dune artificially; or
>
> "(f) interfering with mapped or otherwise identified bird nesting habitat."

310 Code Mass. Regs. § 10.28(3) (1997).

provided that they adhere to" those standards. 310 Code Mass. Regs. § 10.28(5) (1997).[15] Corcoran argues that this list was intended to be exclusive and therefore that other proposed uses, including boat storage, cannot be permitted regardless of whether the performance standards set forth in 310 Code Mass. Regs. § 10.28(3) would be met.[16]

DEP interprets the three approvable uses listed in 310 Code Mass. Regs. § 10.28(5) as illustrative, not exclusive. Corcoran's claim that this reading is erroneous faces a "formidable burden." *Conservation Commn. of Brockton* v. *Department of Envtl. Protection*, 81 Mass. App. Ct. 601, 605 (2012), quoting from *Northbridge* v. *Natick*, 394 Mass. 70, 74 (1985). An agency's interpretation of its own regulations is entitled to "considerable deference" and must be upheld unless it is inconsistent with the plain language of the regulation or otherwise arbitrary or unreasonable. *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991). In this context, as with review of agency decisions generally, courts must accord "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Ten Local Citizen Group* v. *New England Wind, LLC*, 457 Mass. 222, 228 (2010), quoting from *Friends & Fishers of the Edgartown Great Pond, Inc.* v. *Department of Envtl. Protection*, 446 Mass. 830, 836 (2006).

While 310 Code Mass. Regs. § 10.28(5) lists three specific uses that "may" be allowed, there is no language there that expressly states — or necessarily implies — that other uses are prohibited. Thus, even if the regulatory language can be inter-

---

[15]Those types of projects are:

"(a) pedestrian walkways, designed to minimize the disturbance to the vegetative cover and traditional bird nesting habitat;

"(b) fencing and other devices designed to increase dune development; and

"(c) plantings compatible with the natural vegetative cover."

310 Code Mass. Regs. § 10.28(5) (1997).

[16]All parties agree that a separate provision addressing existing structures and accessories thereto is not relevant here. See 310 Code Mass. Regs. § 10.28(4) (1997). Also inapplicable are additional restrictions regarding rare species habitat. 310 Code Mass. Regs. § 10.28(6) (1997).

preted as Corcoran prefers, there is nothing in that language that mandates that such an interpretation be adopted. Contrast *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. at 551-552 (rejecting DEP's position that a regulation governing manmade ponds created "by impoundment" also applied to manmade ponds created "by excavation").

Corcoran argues that DEP's interpretation would render 310 Code Mass. Regs. § 10.28(5) superfluous and therefore cannot be correct. See *Warcewicz* v. *Department of Envtl. Protection*, *supra* at 551, quoting from *Bottomley* v. *Division of Administrative Law Appeals*, 22 Mass. App. Ct. 652, 657 (1986) ("Where reasonably possible, no portion of the language of a regulation should be treated as surplusage"). Specifically, he argues that under DEP's interpretation, which would allow approval of any project that meets the performance standards set forth in 310 Code Mass. Regs. § 10.28(3), the separate listing of three allowable uses in 310 Code Mass. Regs. § 10.28(5) would add nothing (since these specific uses themselves must meet the performance standards). We disagree. The enumeration of the three specific allowable uses still serves at least two functions. First, it provides illustrative examples of three kinds of projects that generally are approvable, while underscoring (for issuing authorities and regulated parties alike) that such seemingly benign projects still must be designed to ensure that the strict performance standards set forth in 310 Code Mass. Regs. § 10.28(3) are met. Second, in light of the limited nature of the three types of projects specifically identified as approvable in § 10.28(5) (see note 15, *supra*), the list serves to highlight the high degree of scrutiny that other types of projects are to be given. Thus, DEP's interpretation does not render 310 Code Mass. Regs. § 10.28(5) superfluous.

Nor can Corcoran show that DEP's interpretation is otherwise arbitrary or unreasonable. The only projects that could win approval under DEP's interpretation are those shown to meet the strict performance standards set forth in 310 Code Mass. Regs. § 10.28(3), under which no "adverse effect[s]" are allowed. There is no inconsistency between that result and the over-all thrust of the act. See *Citizens for Responsible Envtl. Mgmt.* v. *Attleboro Mall, Inc.*, 400 Mass. at 669 (noting that the act "does not lay down absolute use prohibitions" and instead "requires

no more of [DEP] than that it impose such conditions . . . as will contribute to the protection of the interests described" [citations omitted]).

b. *Whether DEP erred in applying the performance standards.* Corcoran's second argument has to do with how the performance standards are to be measured. Specifically, Corcoran argues that DEP improperly used the currently degraded state of the dune as the baseline for determining whether the proposed project would have an "adverse effect." There is a great deal of force to the notion that an applicant seeking approval to alter a wetlands resource area should not obtain the benefit of a lowered baseline reflecting the adverse impacts that its own unauthorized activities have already created. However, it does not follow that the current degraded state of a wetlands resource area is something that DEP cannot take into consideration. Notably, although the DEP presiding officer began with the current state of the dune as her initial point of reference, she did not end there.[17] Instead, she identified a three-year time frame as the appropriate period for Sea Pines to demonstrate that it could both re-establish vegetation on the dune and operate seasonal kayak storage racks there without causing any ongoing adverse impacts. There is nothing in the language of the regulations that precludes DEP from adopting this temporal perspective in determining whether its performance standards will be met.[18]

To be sure, as Corcoran highlights, DEP approved the project

---

[17]At one point in her decision, the presiding officer stated her conclusion "that the performance standard is applied from the perspective of the dune as it exists at the time of the filing of the Notice of Intent, and that the project, with the planting and fencing[,] will improve the condition of the existing dune and meets the performance standard of no adverse effect on the dune." However, the presiding officer did not stop there but, instead, structured the approval to try to ensure that the dune would be restored within three years. We do not rely on suggestions in DEP's appellate brief that all that matters is whether the future state of the dune will be no worse than its degraded state at the time the notice of intent was filed. This is demonstrably not the approach that the presiding officer herself took.

[18]The dynamic nature of coastal dunes further complicates the question what temporal points of reference are appropriate for consideration. Corcoran is not arguing that DEP must apply the no adverse impact test by comparing the post-project dune to what the state of it would have been had there been no historic boat storage there. Rather, Corcoran is arguing that DEP should look forward, taking into consideration the uncontested fact that the dune will

despite the fact that its technical staff remained somewhat skeptical about whether the proposed replanting efforts would actually succeed. It is also perhaps true, as Corcoran suggested at oral argument, that DEP's final decision might accurately be characterized as a practical "compromise" (one that seeks to achieve restoration of the dune while allowing Sea Pines's long-standing kayak storage practice to continue). However, the fact that DEP has to make its regulatory decisions in the face of scientific uncertainty and in a practical, real-world context does not assist Corcoran absent a demonstrated violation of the agency's statutory or regulatory duties. To the contrary, such considerations highlight the appropriateness of leaving such policymaking to executive agencies armed with both technical expertise and statutorily-delegated authority. See, e.g., *DiCicco v. Department of Envtl. Protection*, 64 Mass. App. Ct. 423, 426-428 (2005) (upholding an order that allowed a town to replicate wetlands lost through the construction of athletic fields in lieu of restoring the area to its original condition).

In the end, DEP provided Sea Pines only temporary approval to resume kayak storage on the dune, and its approval is structured toward ensuring that the applicable performance standards are met. Corcoran cannot demonstrate that the agency violated its regulations.

*Judgment affirmed.*

---

"eventually" recover if it is simply left alone. According to Corcoran, "Since this dune would restore itself naturally, and since the project will very likely impede the full success of that natural restoration, the project, by definition, has an adverse effect on the dune." However, the time frame under which natural restoration would occur was never established, and it is undisputed that the project is designed to try to achieve restoration on a more expedited basis.