NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-908                                           Appeals Court

MICHAEL J. PERISHO & others[1] vs. BOARD OF HEALTH OF STOW &
others.[2]

No. 22-P-908.

Middlesex.     September 11, 2023. – December 13, 2023.

Present:  Milkey, Blake, & Sacks, JJ.

Practice, Civil, Action in nature of certiorari, Standing,
    Judgment on the pleadings, Motion to dismiss.  Municipal
    Corporations, Board of health.  Department of Environmental
    Protection.  Administrative Law, Regulations.  Real
    Property, Water, Nuisance, Trespass.  Nuisance.  Trespass.
    Sewage Disposal.

Civil action commenced in the Superior Court Department on
July 10, 2020.

A motion to dismiss was heard by Joshua I. Wall, J., and
the remaining claim also was heard by him on motions for
judgment on the pleadings.

Daniel C. Hill for the plaintiffs.
Amy E. Kwesell for town of Stow.

_____

[1] Jeremy M. Perisho, Huy D. Le, Kelly N. Melcher, and James
Olsson.

[2] Town of Stow and Habitat for Humanity, North Central
Massachusetts, Inc.

David Y. Bannard for Habitat for Humanity, North Central Massachusetts, Inc.

SACKS, J.  The plaintiffs, who are abutters or near neighbors to a proposed two-family affordable housing development in Stow, brought this action in the Superior Court seeking certiorari review of a decision of the board of health of Stow (board) granting a septic system construction permit (permit) to the developer, Habitat for Humanity of North Central Massachusetts, Inc. (Habitat).  The plaintiffs, to whom we will refer as abutters,[3] allege that pollution from the septic system would cause nitrogen levels at the private wells serving their homes to exceed the level set by State drinking water regulations.  They allege that "[t]he presence of elevated levels of [n]itrogen in wells is an established indicator of the presence of other contaminants commonly associated with domestic wastewater, including viruses and pharmaceuticals."  The abutters also assert claims for private nuisance and trespass against Habitat, seeking injunctive relief.

After agreeing that the abutters had standing to challenge the board's decision, a judge affirmed that decision on the merits, thereby upholding the permit.  In a separate ruling, the

---

[3] The plaintiffs Le and Melcher own and live in a home abutting the locus.  The Perishos and Olsson own and live in homes located across a public way from the locus.  Each of the three homes is served by its own private well.

judge dismissed the nuisance and trespass claims without prejudice for failure to state a claim, because the abutters had not pleaded an actual or inevitable invasion of or entry on their land.  On the abutters' appeal, we affirm so much of the judgment as upheld the board's decision issuing the permit; we reverse the dismissal of the nuisance and trespass claims and remand for further proceedings.

Background.  Under the Title 5 regulations issued by the state Department of Environmental Protection (DEP), 310 Code Mass. Regs. §§ 15.001 (2014), construction of a septic system generally requires a permit from a local board of health.  See 310 Code Mass. Regs. § 15.020 (2014).  In 2017, Habitat applied to the board for such a permit for the locus, a 1.26 acre parcel on a hillside in Stow.  Habitat's septic system plans called for wastewater from the two new homes to flow into the system's pump chamber and septic tank and then be pumped uphill to a leaching field on a slope behind the homes.  The abutters' wells are located downhill from the proposed leaching field, at distances of approximately 120-150 feet.  The abutters claim that wastewater discharged from the leaching field will mix with groundwater and then flow downhill toward their wells.

The board chose James Garreffi of the Nashoba Associated Boards of Health to review the permit application.  Over the course of a more than two-year review process, the board

received and considered comments from the abutters' hydrologist, Scott Horsley,[4] and the abutters' counsel, opposing issuance of the permit.  The abutters argued, among other things, that (1) based on a "mass balance analysis" performed by Horsley, the system would cause excessive nitrogen levels at the abutters' wells; and (2) the plans did not show compliance with Title 5 regulations that require a four-foot vertical separation between the bottom of the soil absorption system and existing groundwater levels.

The board received substantial input from Habitat's engineering firm, Stamski and McNary, Inc. (Stamski), addressing the abutters' concerns and responding to some of them by making changes to the plans.  In addition, the board obtained a review of the plans from the engineering firm of David E. Ross Associates, Inc. (Ross).  Ross's review also found "no issues relative to compliance with Title 5."  Garreffi ultimately concluded that the plans met "the requirements of Title 5."  The board issued the permit in March of 2020.

---

[4] Although Horsley was not formally qualified as an expert in these proceedings, the record includes his affidavit attesting to his more than "thirty years of experience in evaluating water resources projects, including the interaction of groundwater, stormwater runoff and sources of water pollution."  He asserts that he has "been an expert witness in several prior litigation matters in state court as well as administrative appeals before the DEP."

The abutters then commenced this action seeking certiorari review of the board's permit decision and separately asserting nuisance and trespass claims against Habitat. On Habitat's motion to dismiss the latter claims for failure to state a claim on which relief could be granted,[5] the judge ruled, as noted supra, that the abutters had not pleaded any actual or inevitable invasion of or entry on their land. He dismissed the claims without prejudice.[6]

---

[5] Habitat supported its motion with an affidavit from its engineering firm, Stamski, asserting that if the system were installed and maintained as designed, "no effluent from the sewage disposal system will adversely impact abutting land. The system, as designed, is intended and expected to protect neighboring properties, including wells located on such land, from contamination by effluent leaching from the system." Habitat also submitted an affidavit from its executive director, recounting the lengthy review and approval process and noting that the affordable housing project development itself, first proposed in 2016, was being further delayed by the abutters' action. The abutters, for their part, submitted affidavits contesting Habitat's assertions. Nothing in the judge's decision, however, relied on any of these materials in ruling on the motion to dismiss the nuisance and trespass claims or in resolving the certiorari claim.

[6] The abutters then unsuccessfully sought interlocutory relief from a single justice under G. L. c. 231, § 118, first par. Habitat now argues that the abutters' remedy was to appeal the single justice's order and that this appeal from the Superior Court's final judgment is foreclosed. The single justice's order was not appealable as of right, however, and the present appeal is proper. See Brauner v. Valley, 101 Mass. App. Ct. 61, 68-69 (2022). Nor, contrary to Habitat's argument, was the single justice's order a final judgment giving rise to claim or issue preclusion.

Subsequently, on the certiorari claim, the judge first rejected the board's and Habitat's argument that the abutters lacked standing to challenge the board's decision. On the merits, however, the judge ruled that Title 5 regulations did not require the board to apply the mass balance analysis underlying Horsley's nitrogen level predictions, and that sufficient evidence supported the board's conclusion that the four-foot vertical separation requirement was met. This appeal followed.

Discussion. We first address the certiorari claim, as that discussion will inform our review of the nuisance and trespass claims.

1. Certiorari. "To obtain certiorari review of an administrative decision, the following three elements must be present: (1) a judicial or quasi judicial proceeding, (2) from which there is no other reasonably adequate remedy, and (3) a substantial injury or injustice arising from the proceeding under review." Indeck v. Clients' Sec. Bd., 450 Mass. 379, 385 (2008). Certiorari review "is calibrated to the nature of the action for which review is sought," Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 604 (2017), and thus may involve either the substantial evidence standard or the arbitrary and capricious standard. See id. at 604-605. The abutters assert that both standards apply. Ultimately we need not decide which

standard applies, because we conclude the board's decision is neither unsupported by substantial evidence nor arbitrary and capricious.

a.  Standing.  To have standing to seek certiorari review, the abutters must show "a reasonable likelihood that [they have] suffered injury to a protected legal right."  Higby/Fulton Vineyard, LLC v. Board of Health of Tisbury, 70 Mass. App. Ct. 848, 850 (2007).  See Hickey v. Conservation Comm'n of Dennis, 93 Mass. App. Ct. 655, 657 (2018).  Here, the board contends that the abutters' allegations of future harm are too speculative and theoretical to support standing.  See Higby/Fulton Vineyard, LLC, supra at 851-852 (speculation is insufficient).  See also Hickey, supra at 658 (same).  We are not persuaded.

The abutters' complaint alleges, based on the mass balance analysis furnished to the board by the abutters' hydrologist, Horsley, that the proposed septic system would cause predicted nitrogen levels at two of the abutters' wells to reach 27.3 milligrams per liter (mg/l) and 29.0 mg/l, in excess of State drinking water standards of 10 mg/liter.  Horsley stated that his "analysis is conservative in that [he had] not added fertilizer applications.  Actual nitrate-nitrogen concentrations will be higher."  Although, as discussed infra, the board was not obligated to give any particular weight to Horsley's

analysis, and had reason to question it, this is not fatal to the abutters' standing.

Standing "does not require that the factfinder ultimately find a plaintiff's allegations meritorious.  To do so would be to deny standing, after the fact, to any unsuccessful plaintiff.  Rather, the plaintiff must put forth credible evidence to substantiate his allegations."  Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 721 (1996).  Where a plaintiff has "presented credible evidence of injury to legal rights of the type intended to be protected by the [governing regulatory scheme], that [a] judge ultimately found that the elevated nitrogen would not reach the plaintiff's well goes to his success on the merits and not his ability to challenge the acts of the board."  Reynolds v. Zoning Bd. of Appeals of Stow, 88 Mass. App. Ct. 339, 346 (2015).[7]

This is not a case where plaintiffs' claims of injury are raised "in a conclusory fashion, and [are unsupported by] expert

---

[7] Marashlian and Reynolds were actions for judicial review of zoning board decisions under G. L. c. 40A, § 17 -- a proceeding that ordinarily requires fact finding by the court -- and thus are not fully applicable to a certiorari proceeding, which ordinarily involves no such fact finding.  Nevertheless, the point remains that a plaintiff should not be required to prove its case on the merits in order to establish standing to challenge an administrative decision in the first place.  Cf. Revere v. Massachusetts Gaming Comm'n, 476 Mass. at 603-604 (noting that standing to obtain certiorari review depends on alleging injury to justiciable right, even if claim of constitutional violation ultimately fails on merits).

evidence, technical analysis, or particular facts in the record that establish [the purported risks]." Hickey, 93 Mass. App. Ct. at 658. Nor is this a case where "the expert, having done no calculations or testing, was unable to express any opinion more specific or definitive than . . . references to potential, likelihood, and possibility." Higby/Fulton Vineyard, LLC, 70 Mass. App. Ct. at 851. Finally, it is not a case where the plaintiffs have failed to credibly allege "an injury different in nature or magnitude from that of the general public." Friedman v. Conservation Comm'n of Edgartown, 62 Mass. App. Ct. 539, 543 (2004). The abutters' specific allegations of likely pollution of their private wells, supported by technical evidence from a qualified hydrologist, are sufficient to establish standing to challenge the board's decision.[8] We therefore proceed to the merits.

b. Well pollution. The abutters' first challenge to the permit is that, based on Horsley's mass balance analysis, the septic system will increase nitrogen in their wells to levels above the 10 mg/l State drinking water standard. As the

_____

[8] Even if we viewed standing as doubtful, there is no absolute rule that the question must be resolved in a plaintiff's favor before reaching the merits, particularly where the result in any event would be to leave an agency's decision undisturbed. See Mostyn v. Department of Envtl. Protection, 83 Mass. App. Ct. 788, 792 & n.12 (2013). See also Green v. Zoning Bd. of Appeals of Southborough, 96 Mass. App. Ct. 126, 129 (2019).

abutters recognized both in the board proceedings and on appeal, however, Title 5 regulations do not require the board to apply the mass balance analysis to Habitat's proposed system. This is because the system's design flow of 436 gallons per day per acre (GPDPA), falls below both the regulatory threshold of 440 GPDPA for applying nitrogen loading limitations,[9] and the 2,000 GPDPA threshold established by DEP's "Guidelines for Title 5 Aggregation of Flows and Nitrogen Loading" (DEP guidelines) for using a mass balance analysis to show that a system meets the 10 mg/l nitrogen standard.[10] Habitat's engineer, Stamski, asserted that the mass balance analysis was inapplicable, and the board's

---

[9] Under 310 Code Mass. Regs. § 15.214 (2014) ("Nitrogen Loading Limitations"), as relevant here, no septic system serving new construction in either a designated "nitrogen sensitive area" or an area where both an on-site system and a drinking water supply well will serve the facility shall be designed to receive or shall receive more than 440 [GPDPA] "except as set forth at 310 [Code Mass. Regs. §] 15.216 (aggregate flows)." In turn, 310 Code Mass. Regs. § 15.216 (2014) ("Aggregate Determinations of Flows and Nitrogen Loading") provides, as relevant here, that the 440 GPDPA nitrogen loading limitation "may be calculated in the aggregate by using nitrogen credit land in accordance with an approved Facility Aggregation Plan," to be prepared in accordance with DEP's "Guidelines for Title 5 Aggregation of Flows and Nitrogen Loading."

[10] The DEP guidelines referenced in 310 Code Mass. Regs. § 15.216 provide, as relevant here, that, for septic systems with a design flow from 2,000 to 10,000 gallons per day, a board of health "may require" the project proponent to "demonstrate, through a site-specific mass balance analysis, that the proposed discharge will meet the groundwater quality standard of 10 mg/l total nitrogen" at the "nearest sensitive receptor," which may be a private well.

agent, Garreffi, agreed. Even assuming without deciding that the DEP guidelines leave room for a board to exercise its discretion to consider a mass balance analysis where none is required, as the abutters argue, the board did not abuse its discretion in declining to give the analysis dispositive weight, for the following reasons.

Stamski reviewed Horsley's mass balance calculations and asserted to the board that they were "grossly flawed." In particular, Stamski asserted that the land areas that Horsley used to calculate the amount of groundwater recharge available to dilute the septic system's nitrogen discharge were "significantly underestimated and invalid."[11] Garreffi also noted that Horsley had completed only two of the four components of the mass balance analysis set forth in the DEP guidelines.

Although the abutters argued to the board that the missing elements of the analysis did not call Horsley's conclusions into question, at oral argument the abutters conceded that whether to accept Horsley's analysis required "a credibility judgment." And "[i]t is for the agency, not the courts, to weigh the

---

[11] Under the DEP guidelines, the nitrogen analysis component of a mass balance analysis requires calculation of a septic system's "area of impact" (AOI). The AOI may be described as that area of land, down-gradient of the system discharge, that is available to absorb precipitation, which recharges the groundwater and thereby dilutes the nitrogen in the discharge before it reaches a well or other sensitive receptor.

credibility of witnesses and to resolve factual disputes.  A
court may not displace an administrative board's choice between
two fairly conflicting views, even [if] the court would
justifiably have made a different choice had the matter been
before it de novo" (quotation and citation omitted).  Embers of
Salisbury, Inc. v. Alcoholic Beverages Control Comm'n, 401 Mass.
526, 529 (1988).  See Dubuque v. Conservation Comm'n of
Barnstable, 58 Mass. App. Ct. 824, 829 (2003) (same, in
certiorari case).

Finally, even assuming that Horsley's calculations were
accurate, the abutters acknowledged at oral argument that
nothing in Title 5 itself prohibits a septic system from causing
nitrogen levels to exceed the State drinking water standard at
an abutter's private well.  Nor does Title 5 provide for
revocation of a system's construction permit on that basis.
Thus the board was not required to deny Habitat the permit on
the basis of Horsley's calculations.

There is nothing to the contrary in Reynolds, which arose
not under Title 5 but instead under G. L. c. 40B, governing
comprehensive permits for affordable housing developments.  See
Reynolds, 88 Mass. App. Ct. at 339-340.  There, the plaintiff
challenged a zoning board's issuance of a comprehensive permit,
on the basis, among others, that the proposed sewage disposal
system would cause nitrogen levels at a neighbor's well to

exceed 10 mg/l, making it unreasonable for the board to have waived certain waste disposal limitations contained in a town bylaw.  Id. at 340, 342.  A judge, despite crediting the evidence of excess nitrogen levels, upheld the permit, ruling it sufficient that the system was designed to comply with DEP's Title 5 regulations, which did not require proof that neighboring wells would not experience elevated nitrogen levels.  See id. at 342, 347.

On appeal, this court proceeded on the basis that the system complied with Title 5.[12]  See Reynolds, 88 Mass. App. Ct. at 348.  The court ruled, however, that as a G. L. c. 40B matter, it was unreasonable for the board to have waived the more health-protective provisions of the town bylaw in order to help meet the need for affordable housing.  See id. at 350.  The court therefore invalidated the comprehensive permit.  See id.

The present case, in contrast, is a challenge under Title 5 to a septic system construction permit.  Indeed, here, the town's zoning board, in issuing a comprehensive permit, denied Habitat's request under G. L. c. 40B to waive a local leaching area requirement that was more health-protective than Title 5.

---

[12] The court questioned, but did not resolve, whether Title 5's nitrogen loading limitations might apply.  See Reynolds, 88 Mass. App. Ct. at 347-348 & nn.13-14.  Here, it is undisputed that they do not, because the system's design flow of 436 GPDPA, is less than the 440 GPDPA threshold of 310 Code Mass. Regs. § 15.214.

The G. L. c. 40B ruling in Reynolds does not control here, and the board did not abuse its discretion in issuing the permit notwithstanding Horsley's mass balance analysis.

c. Vertical separation. The abutters' second challenge to the permit concerns Title 5's "vertical separation" requirement: that the bottom of the "soil absorption system" (SAS) be a minimum of four feet above the high ground-water elevation (HGWE). 310 Code Mass. Regs. § 15.212(1)(a) (2014).[13] According to Stamski, test pits in and adjacent to the proposed leaching area (the location of the SAS) showed the HGWE "consistently at 3 [feet] below the surface." The plans included data from seven test pits, located in, to either side of, and downhill from the SAS. In each of those pits, the HGWE was three feet or more below the surface. Garreffi, who had witnessed some of those tests, concurred, noting that one of the test pits was only nine feet from the uphill corner of the SAS. Stamski stated that the bottom of the relevant component of the SAS would be located one foot above the existing surface and thus four feet above the

---

[13] More precisely, that regulation provides: "The minimum vertical separation distance between the bottom of the stone underlying the soil absorption system above the high ground-water elevation shall be (a) four feet in soils with a recorded percolation rate of more than two minutes per inch." 310 Code Mass. Regs. § 15.212(1)(a). There is no dispute that the soil at issue here meets that percolation rate requirement. A soil absorption system is defined in 310 Code Mass. Regs. § 15.002 (2006), and includes a system's leaching area.

HGWE.  As Garreffi recognized, and as the plans showed, this would require the installation of fill material.

To challenge this, the abutters submitted Horsley's calculations of the slope of the water table, based on which he predicted that the HGWE at the uphill edge of the SAS system would be less than three feet below the existing surface, and thus less than four feet below the SAS.  Horsley also cited data from test pits some distance uphill from the SAS, showing the HGWE to be from twenty to twenty-five inches (i.e., less than three feet) below the existing surface.

Although the abutters characterize this as "uncontroverted evidence" that the septic system would violate the vertical separation requirement, it was directly controverted by Stamski's assertion, supported by data from seven test pits in and adjacent to the proposed SAS, that the HGWE was "consistently at 3 [feet] below the surface."  On this record, the board did not abuse its discretion by declining to accept either Horsley's methodology (extrapolating the slope of the water table from a small number of points) or the inferences he drew from test pit data gathered some distance uphill from the SAS.  Substantial evidence from Stamski, with which Garreffi concurred, supported the board's conclusion that the vertical

separation requirement would be met.[14]  As we stated supra, we will not displace the board's choice between two fairly conflicting views.[15]  See Embers of Salisbury, Inc., 401 Mass. at 529.  The abutters' certiorari challenge to the board's decision was properly rejected.

2.  Private nuisance and trespass claims.  As stated supra, the judge dismissed the nuisance and trespass claims against Habitat for failure to state a claim, because the abutters had not pleaded an actual or inevitable invasion of or entry on their land.  We review the sufficiency of the complaint de novo, taking as true its factual allegations and drawing all reasonable inferences in the abutters' favor.  See Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011).  "[W]e look beyond the conclusory allegations in the complaint and focus on

---

[14] At oral argument, the board acknowledged that if, during construction, the HGWE is found to be higher than expected, additional fill in the form of septic sand can be placed underneath the relevant component of the SAS so as to elevate it four feet above the HGWE.

[15] It is of no moment here that the judge, in affirming the board's decision on this point, also referred to Title 5's separate requirement of "at least a four foot depth of naturally occurring pervious soil below the entire area of the soil absorption area."  310 Code Mass. Regs. § 15.240(1) (2014).  A judge's decision on certiorari review is a ruling of law based on the record before the board, "not a finding of fact or one that in some way involves evidence or credibility determinations, [and so] we give it no special deference."  Macero v. MacDonald, 73 Mass. App. Ct. 360, 366 (2008).  "Our review is essentially de novo," based on the same administrative record that was before the judge.  Id.

whether the factual allegations plausibly suggest an entitlement to relief." Id., citing Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-636 (2008).

A private nuisance claim requires that a defendant have "caused a substantial and unreasonable interference with the use and enjoyment of the property of the plaintiff" (quotation and citation omitted). Rattigan v. Wile, 445 Mass. 850, 856 (2006). And "[a] trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." Amaral v. Cuppels, 64 Mass. App. Ct. 85, 91 (2005), quoting Restatement (Second) of Torts § 821D comment d (1979).[16]

Importantly, "[o]ne is not required to wait until he is injured before he can apply to a court of equity for relief, but he is not entitled to seek relief unless the apprehended danger is so near as at least to be reasonably imminent." Shaw v. Harding, 306 Mass. 441, 449 (1940). See Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 23 (2006) (same); City Council of Boston v. Department of Pub. Utils., 7 Mass. App. Ct. 379, 380-381 (1979) (same). "A permanent injunction should not be granted to prohibit acts that

---

[16] "The requirement that the interference with the use of land be 'unreasonable' and 'substantial' helps to distinguish nuisance from trespass, which may be actionable regardless of whether the conduct is reasonable or the harm measurable." Rattigan, 445 Mass. at 856 n.13.

there is no reasonable basis to fear will occur." Lightlab Imaging, Inc. v. Axsun Techs., Inc., 469 Mass. 181, 194 (2014).

The complaint here alleged that, based on Horsley's mass balance analysis, the nitrogen levels at each of the abutters' wells "would exceed" the safe drinking water threshold of 10 mg/l. It further alleged that once the septic system is operational, "pollution will travel through groundwater and into the [abutters'] wells," substantially and unreasonably interfering with their use and enjoyment, and invading their interests in the exclusive possession, of their properties.

In dismissing the nuisance and trespass claims, the judge stated that the board's approval of the septic system under Title 5, although challenged by the abutters, showed that their "claim that invasion and intrusion are undisputedly inevitable and certain cannot be credited; invasion and intrusion are hotly disputed." But, faced with this dispute, the judge was required to take the complaint's factual allegations as true and to draw all reasonable inferences in the abutters' favor. See Curtis, 458 Mass. at 676. That Habitat's design for the system complied with Title 5 did not guarantee as a factual matter that the system would perform so as not to pollute the abutters' wells. Nor have the parties identified any remedy provided by Title 5 if such pollution occurs. See supra at        .

Moreover, whether the complaint stated nuisance and trespass claims did not depend on whether interference with or invasion of the abutters' properties was shown to be undisputedly inevitable and certain.  Rather, the question is whether the complaint sufficiently alleged that the injuries are "so near as at least to be reasonably imminent."  Shaw, 306 Mass. at 449.  Drawing all reasonable inferences in the abutters' favor, the complaint did so.[17]  Although the septic system has not yet been constructed and thus is not yet operational, we decline to rule that the abutters must await the discharge of effluent from the system before being permitted to seek injunctive relief.  Whether the abutters will be able to prove that the injuries are at least reasonably imminent, so as to entitle them not merely to seek but to obtain relief, is to be determined after further proceedings.[18]

---

[17] On appeal the parties have not argued any other issue as to whether the complaint stated nuisance and trespass claims. Our ruling is limited to whether the conditions and events that assertedly would constitute a nuisance or a trespass were alleged to be sufficiently imminent to state claims for injunctive relief.

[18] In this connection we note that ordinarily an anticipatory injunction against a nuisance "cannot be obtained where the nuisance depends upon the way in which an enterprise is conducted, rather than upon the essential character of the enterprise itself."  Dubois v. Board of Selectmen of Dartmouth, 2 Mass. App. Ct. 674, 679 (1974), quoting R. Powell, Real Property § 707, at 344.6 (1971).  See 9 R. Powell, Real Property § 64.04[3] (M. Wolf ed. 2023).  Whether that principle has any application to a septic system is a question for another day.

Conclusion. The judgment of dismissal is affirmed as to count one (certiorari) and is reversed as to counts two (private nuisance) and three (trespass); as to those claims, the case is remanded for further proceedings.

So ordered.