NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-663                                        Appeals Court

      GREGORY REYNOLDS  vs.  ZONING BOARD OF APPEALS OF STOW &
                          another.[1]


                        No. 14-P-663.

      Middlesex.      January 13, 2015. - September 15, 2015.

            Present:  Trainor, Vuono, Hanlon, JJ.


Housing.  Zoning, Board of appeals:  decision; Low and moderate
      income housing; Comprehensive permit.  Practice, Civil,
      Standing.


      Civil action commenced in the Superior Court Department on
November 23, 2010.

      The case was heard by Kenneth W. Salinger, J.


      Dennis A. Murphy (Daniel C. Hill with him) for the
plaintiff.
      David S. Weiss (Elizabeth Levine with him) for Stow Elderly
Housing Corporation.
      Barbara Huggins for zoning board of appeals of Stow.


      TRAINOR, J.  The plaintiff appeals from a Superior Court

judgment affirming a comprehensive permit issued pursuant to the

Comprehensive Permit Act, G. L. c. 40B, §§ 20-23 (Act), by the

_____

      [1] Stow Elderly Housing Corporation.

zoning board of appeals (board) of Stow (town) to the Stow Elderly Housing Corporation (SEHC) for the construction of a low and moderate income elderly housing project. The plaintiff, a southeast abutter of the locus, contended, among other things, that the private wells on his and his neighbors' properties will have elevated nitrogen levels due to the discharge into the waste disposal system designed for the locus and, therefore, it was unreasonable for the board to waive certain waste disposal limitations contained in the town bylaw. Stow, Mass., Zoning Bylaw (including amendments through May 3, 2010) (bylaw). For the reasons set forth below, we reverse.

1. Background. a. Stow Elderly Housing Corporation and Plantation I. SEHC is a nonprofit corporation founded in 1981 for the primary purpose of developing, owning, and operating affordable housing. In 1983, SEHC obtained a comprehensive permit under the Act to construct Plantation Apartments I (Plantation I), a fifty-unit low-income senior apartment complex on a lot that is adjacent to the locus. Plantation I is served by a private well and a private septic system on the property. Although SEHC was the original owner and developer of Plantation I, in 2004, it transferred ownership of the buildings and granted a long-term lease of the land to Plantation Apartments Limited Partnership, while retaining the fee in the land. SEHC

owns and controls the limited partnership's general partner, and was the initial limited partner.[2]

b. <u>Plan for the locus</u>. SEHC is under agreement to purchase an approximately two and one-half acre lot (locus) improved by a single-family home and barn located adjacent to Plantation I. SEHC plans to subdivide the property creating an approximately one-half acre parcel including the existing single-family home and barn (lot 1), an approximately two acre lot on which it proposes to construct "Plantation II," consisting of one three-story building containing thirty-seven one-bedroom units of elderly housing, a fifty-seat function hall, and administrative offices (lot 2). The application for the comprehensive permit requested numerous waivers of the bylaw along with amendments to the comprehensive permit for Plantation I.

The locus is situated in the town's residential district and eighty percent of the locus is also situated in the town's water resource protection district (WRPD), an overlay district. A multi-unit dwelling containing thirty-seven units is not permitted in the residential district.[3] Following the

---

[2] Shortly after creation of the limited partnership, Massachusetts Housing Equity Fund XLLC was substituted as limited partner.

[3] Single-family residences are allowed as of right in the residential district. Multi-family dwellings are permitted in

subdivision of the locus, lot 2 will have no frontage on a public way. SEHC proposes to access the property over an undersized driveway located on Plantation I. The board granted bylaw waivers including, for example, as to use, lot size, frontage, and access requirements.

Notwithstanding that regulations require preliminary plans submitted with a comprehensive permit application to identify the water supply that will serve the project, SEHC has not identified its water source. Its application suggests several possibilities, including private wells from other nearby developments or a private water company. The comprehensive permit issued by the board includes condition 4.4, which provides that "[p]rior to the issuance of a building permit for the Elderly Housing, Applicant shall have obtained a permit or approval(s) to connect the Elderly Housing to a public water supply approved in accordance with then effective regulations

---

the residential district with a special permit but, by definition, they are limited to no more than four units. Bylaw § 1.3. "Independent Adult Residences," described in § 8.7 of the bylaw as "provid[ing] the opportunity for the development of housing most beneficial for the Senior and Elder population of Stow at greater density than would normally be allowed," are allowed only in the business district by special permit. Even duplexes, which are allowed in the residential district by special permit, "[u]nder no circumstances" will be permitted for projects sited in whole or in part in the WRPD. Bylaw § 8.2.2. As § 3.10.1 of the bylaw excludes any use not expressly permitted in the table of uses, the proposed development is not a permitted use in the residential district.

promulgated by the Massachusetts Department of Environmental Protection [(DEP)]."

The record reflects that there is no public water or sewer system that serves the locus or its neighboring properties. The locus will be serviced by a private, on-site sewage disposal system. The sewage disposal system will be located in the WRPD. Indeed, the project's engineer testified at trial that all of the areas to be developed are located in the WRPD. The intent of the WRPD is "to protect, preserve and maintain the existing and potential GROUND WATER supply and GROUND WATER RECHARGE AREAS within the town; to preserve and protect present and potential sources of GROUND WATER supply for the public health and safety; and to conserve the natural resources of the town." Bylaw § 5.2.

The town adopted sewage disposal system regulations for the WRPD that are more protective than State standards.[4] In addition to dimensional zoning waivers, SEHC sought and was granted waivers from the WRPD regulations, including the prohibition of uses generating "on-site sewage disposal exceeding 110 gallons

---

[4] There is an argument to be made that certain Department of Environmental Protection regulations are equivalent to the bylaw, but as discussed below, the judge found that those particular regulations do not apply to the locus.

per day per 10,000 square feet of LOT area."[5]  Bylaw § 5.2.1.1(2).  The judge found that the proposed project will generate approximately 5,500 gallons of sewage and other wastewater per day.  According to the judge, that translates to approximately 700 gallons per day per 10,000 square feet of lot area, which exceeds WRPD's restriction by over six times.

The plaintiff introduced evidence that his well and those of his neighbors would have elevated nitrogen levels due to the proposed development.  The judge rejected the evidence that elevated nitrogen would reach the plaintiff's well, but specifically found "it is more likely than not that the Project will cause nitrogen levels to exceed 10 [parts per million] at the drinking water well serving 37 DeVincent Drive [the plaintiff's neighbor]."[6]  The groundwater quality standard is 10mg/l total nitrogen and 10mg/l nitrate-nitrogen at the boundary or nearest downgradient sensitive receptor.[7]  The board's consultant recommended that "the applicant provide

---

[5]  Additional amounts may be permitted by special permit for uses permitted in the underlying district.  Bylaw § 5.2.2.3.

[6] The judge's findings do not address the harm arising from elevated nitrogen levels.  There was uncontroverted evidence, however, that elevated levels of nitrogen in the water, alone, are a public health threat and possibly indicative of other pollutants.

[7] See 310 Code Mass. Regs. § 22.06(2)(h), (i) (2008); Guidelines for Title 5, Aggregation of Flows and Nitrogen Loading, Department of Environmental Protection (revised 6/3/09).

documentation that the groundwater will meet drinking water standards at the property lines as the abutters are served by on-site wells unless it is the intent to tie them into a public drinking water supply." This recommendation was not adopted by the board. The judge concluded, however, that the comprehensive permit properly was granted because the sewage disposal system, as designed, will meet all applicable State regulations, which do not, in these circumstances, require proof that adjacent wells will not have elevated nitrogen levels as a result.

The board also waived that section of the bylaw that prohibits development in the WRPD that renders more than ten percent of a site impervious. Bylaw § 5.2.1.1(8). As proposed and approved, the project will render impervious approximately forty-two percent of the property located in the WRPD. The judge found, however, that the stormwater management system will direct precipitation falling on impervious areas to underground infiltration beds from which it will percolate into the ground and be available to recharge the groundwater. In fact, the judge found that there will be a slight increase of groundwater recharge compared to predevelopment conditions and concluded that the local concern underlying § 5.2.1.1(8) will be met. Although the board's consultant recommended pretreatment for the reduction of total suspended solids prior to discharge into the

recharge area and an oil and grease separator chamber, these recommendations were not adopted by the board.[8]

Finally, the board waived the board of health regulation requiring septic systems to be designed to handle 150 percent of the estimated daily flow.  As designed, the system serving Plantation II can handle only 100 percent of the estimated daily flow.

c.  Need for low income elderly housing.  One hundred percent of the proposed units will qualify as "low or moderate income housing."  There is no doubt that the town and the region in general have a need for affordable elderly housing.  Indeed, the application suggests the town's subsidized housing stock comprises only six and one-half percent of its total housing stock, and the parties stipulated that at the time of the application, the town's G. L. c. 40B subsidized housing

---

[8] Condition 4.7 of the comprehensive permit requires compliance with DEP regulations and standards governing the management of stormwater runoff.  Notwithstanding this express condition, SEHC's expert took the position at trial that because there is to be no development within 100 feet of wetlands, compliance with DEP regulations is not required.  The judge agreed and concluded that whether the project complies with DEP stormwater rules or polices is not relevant.  The plaintiff does not pursue this argument on appeal.  We note, however, that boards may impose conditions that do not render a project uneconomic.  See G. L. c. 40B, §§ 21-23; Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. 339, 373 (1973). Particularly where the board is waiving local, more restrictive components of its bylaw, it may well have concluded that compliance with DEP stormwater regulations is necessary to protect the groundwater.

inventory was less than ten percent. In appeals before the Housing Appeals Committee, there exists a rebuttable presumption that there is a substantial housing need that outweighs local concerns upon proof that a municipality has failed to satisfy affordable housing goals. 760 Code Mass. Regs. § 56.07(3)(a) (2008).

d. Neighborhood properties. The plaintiff's home abuts the locus to the southeast. His property and those of his neighbors are served by private wells and private septic systems located on their properties. As the plaintiff and his neighbors rely on these wells for their drinking water, the record supports the inference that the area at issue, including the locus and the neighboring residential homes, is dependent on clean groundwater.

2. Discussion. a. The Comprehensive Permit Act and standing. Several cases have described the provisions of the Act, G. L. c. 40B, §§ 20-23, sometimes referred to as the anti-snob zoning act. See Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., 464 Mass. 38, 39-40 (2013). See also Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. 339, 345-355 (1973); Zoning Bd. of Appeals of Greenfield v. Housing Appeals Comm., 15 Mass. App. Ct. 553, 555-557 (1983). For present purposes, we note that "[w]e have long recognized that the Legislature's intent in enacting [the act] is 'to

provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing' in the Commonwealth." Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., supra at 40, quoting from Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 28-29 (2006). Thus, the Legislature has provided a streamlined application process to a single local board which is authorized to waive local requirements and regulations, including zoning ordinances or by-laws, which are not "consistent with local needs." Board of Appeals of Hanover v. Housing Appeals Comm., supra at 355. "'Consistent with local needs' is a term of art under G. L. c. 40B, § 20, defined as follows: '[R]equirements and regulations shall be considered consistent with local needs if they are reasonable in view of the regional need for low and moderate income housing with the number of low income persons in the city or town affected and the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if such requirements and regulations are applied as equally as possible to subsidized and unsubsidized housing.'" Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., supra at 41. On an abutter's appeal from a local board's grant of a comprehensive permit, the board's decision

"cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." Jepson v. Zoning Bd. of Appeals of Ipswich, 450 Mass. 81, 96 (2007) (quotation omitted).[9]

Pursuant to G. L. c. 40B, § 21, a person aggrieved by the board's decision may appeal pursuant to G. L. c. 40A, § 17, to the Superior Court.[10] Many of the oft-cited parameters for "aggrieved-person" status applicable in zoning appeals apply to appeals from a comprehensive permit. Abutters have the benefit of a presumption of aggrievement, but if challenged by evidence warranting a contrary finding, the plaintiff must prove standing by introducing credible evidence of an injury special and different from the concerns of the rest of the community.

---

[9] Where a local board of appeals denies an application for a comprehensive permit, the appellate route is to the Housing Appeals Committee (HAC) for a de novo review to determine whether the board's decision is "reasonable and consistent with local needs." G. L. c. 40B, § 23, inserted by St. 1969, c. 774, § 1. Even where a municipality, as here, "has not met its minimum housing obligation, HAC may still uphold denial of the permit as reasonable and consistent with local needs if the community's need for low or moderate income housing is outweighed by valid planning objections to the proposal based on considerations such as health, site, design, and the need to preserve open space. However, a municipality's failure to meet its minimum housing obligation provide[s] compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal." Zoning Bd. of Appeals of Greenfield v. Housing Appeals Comm., supra at 557 (quotations and citations omitted).

[10] Persons aggrieved may also appeal to the Land Court or the Housing Court. G. L. c. 40A, § 17.

Jepson v. Zoning Bd. of Appeals of Ipswich, supra at 88-89.
"Once a defendant challenges the plaintiff's standing and offers
evidence to support the challenge . . . the jurisdictional issue
is to be decided on the basis of the evidence with no benefit to
the plaintiff from the presumption." Id. at 89 (quotations
omitted). "[A] review of standing based on 'all the evidence'
does not require that the factfinder ultimately find a
plaintiff's allegations meritorious. To do so would be to deny
standing, after the fact, to any unsuccessful plaintiff." Id.
at 91, quoting from Marashlian v. Zoning Bd. of Appeals of
Newburyport, 421 Mass. 719, 721 (1996). Thus, "[t]he 'findings
of fact' a judge is required to make when standing is at issue
. . . differ from the 'findings of fact' the judge must make in
connection with a trial on the merits. Standing is the gateway
through which one must pass en route to an inquiry on the
merits. When the factual inquiry focuses on standing,
therefore, a plaintiff is not required to prove by a
preponderance of the evidence that his or her claims of
particularized or special injury are true. 'Rather, the
plaintiff must put forth credible evidence to substantiate his
allegations. [It is] in this context [that] standing [is]
essentially a question of fact for the trial judge.'" Butler v.
Waltham, 63 Mass. App. Ct. 435, 440-441 (2005), quoting from
Marashlian v. Zoning Bd. of Appeals of Newburyport, supra.

SEHC argues that although the plaintiff supported his claim of standing with expert testimony, because the judge ultimately rejected the evidence that the plaintiff's well would have elevated nitrogen levels, while adopting evidence that an abutter's well will have elevated nitrogen levels, the plaintiff lacks standing to pursue this appeal.  The Supreme Judicial Court has rejected similar arguments in Marashlian v. Board of Appeals of Newburyport, supra at 721-723, and Jepson v. Zoning Bd. of Appeals of Ipswich, supra at 89-91.  Having presented credible evidence of injury to legal rights of the type intended to be protected by the Act, that the judge ultimately found that the elevated nitrogen would not reach the plaintiff's well goes to his success on the merits and not his ability to challenge the acts of the board.  See id. at 91.  See also Butler v. Waltham, supra at 440-442.

b.  Waste disposal system.  On appeal, the plaintiff does not attack the obvious density issues of the project, which might readily call into play the anti-snobbery goals of the Act.  Rather, his arguments focus on the impact on the groundwater serving his and his neighbors' property.  Leaving aside the plaintiff's arguments related to SEHC's failure to identify its water source,[11] we turn directly to the board's decision to waive

---

[11] SEHC contends that its failure to identify its water source is a minor omission and the board's condition that it

its limitation on the amount of sewage that may be introduced into a waste disposal system in the WRPD.

The gist of the judge's decision is that because the system is designed to comply with applicable DEP regulations, the board did not err in granting the comprehensive permit. Generally, DEP does not limit discharge into waste disposal systems servicing less than 10,000 gallons per day,[12] unless the system is in certain "nitrogen sensitive" areas. 310 Code Mass. Regs. §§ 15.214-15.216 (2006). The defendants insist, and the judge agreed, that the State standard for "nitrogen sensitive areas,"

---

connect the development to an appropriate public water source adequately addresses its omission. While we cannot say failing to identify a project's water source in a comprehensive permit application may never be a minor omission, we are skeptical that in the circumstances of this case it constitutes a minor admission. SEHC could not be unaware that the water supply for this particular project would be a major concern for the town and abutters. The appropriate waste disposal requirements in this case turn, in part, on the source of the project's water supply. It is difficult to conceive that the town boards are utterly unconcerned as to the source of the water or the mechanism of delivery to the locus, which will be accessed by an undersized driveway. In its brief, SEHC continues to assert that it may acquire its water from a local private company, private wells on adjacent property, or private wells some distance from the locus. It has not eliminated circumstances where the water source reasonably could be considered to be drawn from the locus, particularly where SEHC owns the property on which Plantation I exists. Moreover, the board's condition that the locus be connected to a "public" water supply does not appear to have eliminated private wells from consideration.

[12] Pursuant to 314 Code Mass. Regs. §§ 5.00 (2009), a groundwater discharge permit is generally required for a wastewater disposal system discharging greater than 10,000 gallons per day.

which would provide roughly equivalent flow limitations as provided in the local regulation for the WRPD, does not apply in these circumstances because SEHC does not propose both an on-site well and on-site waste disposal system and the locus is not located in any of the sites identified in the regulations.[13]  It is not so clear to us that the stricter DEP requirements do not apply here where the area abutting the locus has both on-site wells and on-site waste disposal systems, the actual source of the locus's water supply has not been identified, and SEHC owns an abutting property that contains a fifty-unit apartment complex serviced by an on-site well and on-site waste disposal system.[14]  DEP has not yet had the opportunity to weigh in on the

---

[13] The regulation provides that "[n]o system serving new construction in areas where the use of both on-site systems and drinking water supply wells is proposed to serve the facility shall be designed to receive or shall receive more than 440 gallons of design flow per day per acre from residential uses except as set forth at 310 [Code Mass. Regs. §] 15.216 (aggregate flows) or [§] 15.217 (enhanced nitrogen removal)" (emphasis supplied).  310 Code Mass. Regs. § 15.214(2) (2006). The loading restrictions also apply to "Interim Wellhead Protection Areas and Department approved Zone IIs of public water supplies" and designated nitrogen-sensitive embayments. 310 Code Mass. Regs. § 15.215 (2006).

[14] Under principles of merger existing even prior to our current zoning enabling act, "[a]djacent lots in common ownership will normally be treated as a single lot for zoning purposes so as to minimize nonconformities." Preston v. Board of Appeals of Hull, 51 Mass. App. Ct. 236, 238 (2001), quoting from Seltzer v. Board of Appeals of Orleans, 24 Mass. App. Ct. 521, 522 (1987).  Whether the common-law merger doctrine would apply here has not been raised, but DEP's regulations incorporate a similar theory.  The regulations define "facility"

issue, but at least one of the board's consultants, as well as the plaintiff's expert, opined that the more restrictive, "nitrogen sensitive," DEP requirements would have to be met. Nonetheless, for purposes of this appeal, we accept the judge's conclusion that the more restrictive DEP requirements do not apply to the locus and the State regulations do not limit discharge for systems, such as that proposed, that handle less than 10,000 gallons per day. Thus, the question is whether, in these circumstances, presuming the system meets other applicable State standards, it was reasonable for the board to waive the local, more restrictive, provisions of the bylaw.

The judge relied on Zoning Bd. of Appeals of Holliston v. Housing Appeals Comm., 80 Mass. App. Ct. 406, 416 & n.9 (2011) (Holliston), for the proposition that because the waste disposal

as "[a]ny real property (including any abutting real property) and any buildings thereon, which is served, is proposed to be served, or could in the future be served, by a system or systems, where: (a) legal title is held or controlled by the same owner or owners; or (b) the local Approving Authority or the Department otherwise determines such real property is in single ownership or control pursuant to 310 [Code Mass. Regs. §] 15.011 (aggregation)." 310 Code Mass. Regs. § 15.002 (2006). In addition, 310 Code Mass. Regs. § 15.011 (2006) provides further guidance for making the determination whether facilities are in separate ownership or control for purposes of 310 Code Mass. Regs. §§ 15.000 (2006). That SEHC owns the land on which Plantation I has been constructed and is under agreement to purchase the land for Plantation II, may well be enough for DEP to conclude that Plantation I and Plantation II should be treated as a single facility for the purposes of §§ 15.000, notwithstanding that there may be some organizational differences between the two entities.

system will comply with DEP regulations, it was lawful to issue the comprehensive permit.  It is true that our appellate courts have upheld permits issued where wastewater disposal or stormwater discharge plans were not finalized but approval was conditioned on meeting State requirements.  See Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. at 381; Holliston, supra at 416.  We have little doubt that, in many instances, a condition that requires the developer to meet State waste removal system standards is sufficient to protect local concerns.  Compliance with State standards, however, is not necessarily the end of the inquiry.

In Holliston, we made clear that it was open to the board to justify denying an application for a comprehensive permit by identifying a health or other local concern that (i) supports the denial, (ii) is not adequately addressed by compliance with State standards, and (iii) outweighs the regional housing need.  See id. at 417-419.  In Holliston, we concluded, however, that with regard to environmental contamination, there was no local by-law or regulation that was more protective than the State regulations.  See id. at 417.  And, although the local by-law did have a stricter wetlands buffer zone and stricter stormwater management guidelines, we concluded the board had failed to identify a local interest protected by the stricter regulations that outweighed the local need for affordable housing,

particularly where the substantial evidence showed that the proposed project, as designed, would enhance the wetlands at issue and eliminate existing contamination.  Id. at 420-422.  We concluded that the local board did nothing more than point out that the project violated their more onerous regulations and failed to show that DEP would "be unable to provide adequate protection to current and future residents."  Id. at 419.

Here, the plaintiff's initial complaints about waiving the limit of impervious coverage, which he does not pursue on appeal, are similar to the issues presented in Holliston.  The plaintiff does not refute SEHC's showing that the goals of the bylaw's restriction would be met by the systems put in place to direct all runoff into the ground, thereby actually increasing the level of groundwater recharge from predevelopment levels.  Thus, the plaintiff could not show that the project was inconsistent with local needs in this regard.

With regard to the proposed waste disposal system, on the other hand, the plaintiff does more than simply point at the fact that the proposed development violates the bylaw.  He has presented evidence to support the judge's finding that, as designed and approved, "it is more likely than not" that the project will cause excessive nitrogen levels at the plaintiff's neighbor's well.  The calculations introduced, which support the judge's finding, are in part based on the amount of discharge

the project will introduce on the undersized locus.  SEHC's

expert testified that he found no fault with the accuracy of the

calculations.  Rather, SEHC's expert testified that he simply

made no effort to demonstrate that the system as planned would

not result in elevated nitrogen in the groundwater reaching

abutting wells because the board did not ask him to do so.  He

relied on a presumption, which he contends the State applies,

that provides that if a system is designed in conformance with

State standards, the facility is presumed to protect public

health, safety, and the environment.

What SEHC and its expert continue to ignore is that the

plaintiff presented evidence, adopted by the judge, rebutting

any such presumption.  The judge's finding that the system would

contaminate the groundwater such that unacceptable levels of

nitrogen would reach an abutter's well demonstrates that

compliance with the State standards, which SEHC contends are

applicable and the judge found to be applicable, are

insufficient to protect the groundwater from being contaminated

by the proposed project.  We conclude that the plaintiff has

identified an important local health issue, maintaining clean

groundwater servicing local private wells, that is not

adequately protected by compliance with applicable State

standards.  Cf. Holliston, supra at 417-419.  Enforcement of the

bylaw, however, would restrict the amount of sewage disposal

that may be introduced into the WRPD and thereby protect the adjacent wells.

We next weigh the local concern, the elevated nitrogen levels in the groundwater at the lot line and, in fact, reaching an abutter's well, with the local need for affordable housing. To be sure, the need for affordable elderly housing in the town is real. In weighing the need for affordable housing against local health concerns, however, we are aware of no instance where approval was given to a project that would cause nitrogen levels or other contaminants in a neighboring private well to exceed DEP recommendations. The record does not reflect that the abutters have an alternative water supply. Nor do we mean to suggest that abutters may be forced to connect to an alternative water source, if one were available, so that low income housing may be developed. The Act has no taking component within it. Cf. Zoning Bd. of Appeals of Groton v. Housing Appeals Comm., 451 Mass. 35, 40 (2008) ("The Act does not authorize the committee, directly or indirectly, to order the conveyance of an easement over land abutting the project site of a proposed affordable housing development"). When faced with evidence that one or more adjacent private wells will have elevated nitrogen levels and there is no public water source in the area and no proposal to provide the abutter with clean water, it is unreasonable to conclude that the local need for

affordable housing outweighs the health concerns of existing abutters. In these circumstances, the board's waiver of the bylaw provision limiting the flow into waste disposal systems within the WRPD was unreasonable.

3. <u>Conclusion</u>. The Superior Court judgment affirming the comprehensive permit is reversed. The case is remanded for entry of a judgment revoking the comprehensive permit.

<u>So ordered</u>.