NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-828

ZONING BOARD OF APPEALS OF HINGHAM & another[1]

vs.

HOUSING APPEALS COMMITTEE & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The town of Hingham's zoning board of appeals granted a comprehensive permit pursuant to G. L. c. 40B, §§ 20-23, to the defendant, River Stone, LLC, allowing, with certain conditions, construction of a thirty-two unit housing development that includes affordable housing. On appeal to the Housing Appeals Committee (HAC), the HAC removed certain conditions that the town and the board (collectively, the board) contends were directed toward (1) ensuring safe nitrogen levels in adjacent private wells and (2) ensuring safe roadways, adequate spacing, and safe access for fire safety. The board appealed from the

_____

[1] Town of Hingham.

[2] River Stone, LLC.

HAC's decision to the Land Court pursuant to G. L. c. 40B and G. L. c. 30A, and on cross motions for judgment on the pleadings, a judge of that court entered judgment affirming the HAC's decision. The board now appeals therefrom, arguing that: (1) the HAC abused its discretion in the conclusions it drew when balancing the health risks from excessive nitrogen loading in potable water supplies against the likelihood of nitrogen reaching abutting wells; (2) the HAC violated the board's substantial rights by ordering the board to waive certain road width and setback requirements; and (3) the HAC erred in declining to admit evidence as to the change in percentage of low income housing in Hingham since River Stone's application for a comprehensive permit was filed as relevant to balancing the local concerns raised with the need for affordable housing. We affirm.

Background. The background facts are largely undisputed, and we draw them from the HAC's decision and the administrative record. In March 2016, River Stone applied to the board for a comprehensive permit. The board granted, with conditions, a permit for a thirty-two unit condominium development comprised of twelve separate buildings on a 6.7 acre parcel within the town's Residence B zoning district. The parcel is surrounded by mainly residential single-family dwellings and bounded by wetlands to the east. The units will be connected to a public

2

water supply and will be served by a private wastewater collection system that will transfer sewage to an on-site wastewater treatment plant and soil absorption system.

As proposed, four twenty-foot wide internal roadways would serve the units with a sidewalk on one side. The development will have 4.5 parking spaces per unit and parking will not be allowed on the roadways. Condition C.1(c)(i) requires, however, that the width of traveled roadways be increased from the proposed twenty feet to twenty-four feet.

The Hingham zoning by-laws require a front yard setback of thirty-five feet, and all but three of the proposed units will meet that requirement. Those three units will be within six feet of the property line; the board declined to grant River Stone's request for waivers for the three units. Similarly, the board declined to waive several side and rear setback requirements. Conditions C.1(a)(i)-(iii) impose a minimum front yard setback of thirty-five feet for all units; rear and side setbacks of twenty feet; and twenty feet of separation distance between all buildings. In addition, River Stone requested waivers of the setback requirements for two retaining walls: one wall would be fifteen feet high and five feet from the property line, and another would be twenty feet high and within six feet of the building. The board granted a partial waiver, and imposed condition C.1(e)(ii) requiring an eight-foot setback

3

from the property line and condition C.1(e)(iii) requiring a ten-foot setback from a structure.

Regarding wastewater disposal, River Stone's application proposed to comply with the Title 5 regulations issued by the State Department of Environmental Protection, 310 Code Mass. Regs. § 15.000 (2014), for non-nitrogen sensitive areas, and submitted a design for a system with a flow of 426 gallons per day per 12,500 square feet in lot area. River Stone, through its expert geologist, Peter Dillon, contended that the project is not in a nitrogen-sensitive area as defined by Title 5. See 310 Code Mass. Regs. §§ 15.214-15.216 (2014). However, citing risks to human health such as death, birth defects, miscarriages and other health concerns from the "introduction of excessive nitrogen" in nearby private wells; the town's adoption of more stringent requirements for wastewater treatment plant and soil absorption systems[3] in order to protect the water supply; and its decades-long history of consistently enforcing those regulations and protecting its watershed, the board granted a "partial waiver" from the local standards, and conditioned approval on compliance with one of two options. Condition C.5(a) required River Stone to either (1) reduce the number of proposed bedrooms

---

[3] The local board of health regulations limit sewage flow to 110 gallons per day per 12,500 square feet in lot area.

4

so that the disposal system does not discharge more than 110 gallons of design flow per day per 10,000 square feet in lot area; or (2) design the onsite wastewater disposal system using advanced nitrogen reduction technology.

The board imposed additional conditions, but the parties narrowed the issues before the HAC to the following:  setbacks as they impact safety, density and intensity; the width of the internal roadways; and the effect of the wastewater disposal system on wells on neighboring residential properties.  The HAC determined that the conditions imposed by the board rendered the project uneconomic.  Indeed, the HAC found that the "nitrogen loading" option of reducing bedrooms would limit the project to between twenty-six and twenty-nine bedrooms -- a two-thirds reduction from the ninety proposed bedrooms.  The nitrogen treatment facility alternative would cost $250,000 and an additional $150,000 in site work costs.  On appeal, the board does not challenge the HAC's conclusion that its conditions cause the project to be uneconomic.

So far as the record reveals, the parties agree that excessive nitrogen in water wells is a safety hazard and can lead to serious health issues.  The HAC found, in part, that:

> "[t]he [b]oard has . . . provided evidence to establish
> that Hingham has had a long-standing, documented local
> concern in protecting its already stressed drinking water
> supply from nitrogen contamination, and that this concern
> includes the protection of potable residential wells.

5

Hingham has for many years taken steps to attempt to protect its current and future water supplies and the drinking water of its residents, both public and privately sourced, through the BOH [board of health] Rules establishing a town-wide nitrogen loading standard that is 20% higher than the state standard."

The HAC also found that the board presented evidence through its expert civil engineer, Patrick Brennan, that at least three nearby wells are downgradient from the project.

The HAC noted that the board agreed that the site is not in a nitrogen-sensitive location as defined under State regulations, but that in 1996, the Hingham board of health regulations identified the Weir River Watershed as a nitrogen sensitive area, and the board's expert, Brennan, testified that the designation was necessary to protect nearby wells that are downgradient from the site.[4]  Nonetheless, the HAC credited Dillon who, based on thirty-five years of studying the geology in the area, testified that the "geology of the area indicates bedrock close to or above the surface" and that given the bedrock in the area, there is insufficient vertical gradient to

---

[4] There was evidence that the local public health concern derives from evaluation of the Weir River Watershed, which was classified as "highly susceptible to cross contamination, including nitrogen," and thus more stringent local regulations were established "due to the stressed watershed, residential growth, protection of the public water supply and serious health effects of nitrogen on potable water supplies and private wells."  The HAC also noted Brennan's testimony to the effect that water would flow downgradient, but that bedrock could restrict or block that flow.

6

drive the water down one hundred feet and "there would be no risk of nitrate in the waste reaching the wells." The HAC found Dillon's testimony "to be more credible than that of Mr. Brennan," and concluded that the board had not met its burden to prove that it is more likely than not that abutting wells would be contaminated. The HAC rejected the board's argument that this court's decision in Reynolds v. Zoning Bd. of Appeals of Stow, 88 Mass. App. Ct. 339 (2015) compelled the HAC to uphold the board's decision. The HAC noted that in Reynolds, the Superior Court judge found that it was "more likely than not" that the proposed development would cause excessive nitrogen levels at the neighbor's well and, in the context of that case, we held that the local need for affordable housing did not outweigh the health concerns of abutters. The HAC reasoned that

> "the [b]oard has demonstrated a possibility of serious health risks posed by nitrogen contamination of nearby wells. This likelihood is less than was seen in Reynolds. Here, we are required to balance a much smaller risk of an undoubtedly serious health impact against the affordable housing need. We conclude that the [b]oard has failed to demonstrate that its local concern regarding health risks posed by nitrogen contamination of nearby wells and areas outweighs the need for low or moderate income housing."

Ultimately, the HAC struck condition C.5.

Regarding the road width, the board argued that the condition was necessary because parked service or delivery vehicles or snow might obstruct part of the road and interfere

7

with the minimum roadway width needed for safe passage of emergency vehicles.  Although the town fire marshal testified that the proposed width of twenty feet meets State codes and town requirements, the board's traffic expert testified that a twenty-four foot wide roadway is recommended by the Institute of Transportation Engineers and the American Association of State Highway and Transportation Officials for medium density residential developments.

The HAC, noting that the twenty-foot road width complied with the State fire code; that the board had imposed a condition prohibiting parking on the roads; that the project will have a sidewalk for pedestrian access and 144 parking spaces for thirty-two units, concluded that there was no "greater risk of obstruction by a parked delivery truck than there would be of any other random occurrences."  The HAC concluded that the board had "failed to demonstrate that the asserted potential obstructions on the project roadways represent a valid local concern that outweighs the regional need for affordable housing," and removed the twenty-four foot width requirement.

Similarly, the board argued before the HAC that the board's setback and building separation requirements "seek[] to ensure the quality of the layout of the site for the residents who will live within the project by protecting light and air between buildings and avoid overcrowding."  The HAC noted that a privacy

8

fence protects abutters' views and the "New England Village style buildings emulate single family homes in the surrounding neighborhood," and the project includes 3.65 acres of open space and lawn area. The HAC concluded that the board had not proved a local concern that outweighs the need for affordable housing with regard to the setback requirements.

As for the retaining wall setback requirements, the board reasoned that the fire marshal testified that ten feet was the minimum clearance necessary to set up a ladder to access the upper floor of one of the units from the side and the requirement is necessary for the "safety of future residents and fire fighters." HAC struck the conditions, noting that no fire safety rules or regulations require such a setback, and firefighters will be able to access the upper floor from the front and rear of the unit.

A Land Court judge allowed River Stone's and the HAC's motions for judgment on the pleadings thereby affirming the HAC's decision in all aspects, and judgment entered for the defendants.

Discussion. 1. Standard of review. "There exists a rebuttable presumption that the regional affordable housing need outweighs local concerns where the town's stock of low and moderate income housing is less than ten percent." Zoning Bd. of Appeals of Holliston v. Housing Appeals Comm., 80 Mass. App.

Ct. 406, 414 (2011).  Where, as here, the HAC found that the conditions render the project uneconomic and the board does not refute that conclusion on appeal, the HAC was still required to consider whether the conditions or requirements imposed by the board were consistent with local needs.  See 760 Code Mass. Regs. § 56.07(2)(b)(3) (2008).  Thus, the board had the burden of "proving, first, that there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such conditions, and then, that such Local Concern outweighs the Housing Need."  Id.

"Our review is governed by the familiar standards of G. L. c. 30A, § 14.  We may disturb HAC's decision if we conclude it is, as relevant to the board's arguments, '[i]n excess of the statutory authority or jurisdiction of the agency,' '[u]nsupported by substantial evidence,' or '[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Zoning Bd. of Appeals of Milton v. HD/MW Randolph Ave., LLC, 490 Mass. 257, 262 (2022), (quoting G. L. c. 30A, § 14).  "Although we review questions of law de novo, we are required to give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it, and apply all rational presumptions in favor of the validity of the administrative action" (quotations and citations omitted).  Id.

10

The agency decision may only "be set aside if the evidence . . . points to an overwhelming probability of the contrary" (citation omitted). Pyfrom v. Commissioner of the Dep't of Pub. Welfare, 39 Mass. App. Ct. 621, 625 (1996). "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo" (citation omitted). Zoning Bd. of Appeals of Sunderland v. Sugarbush Meadow, LLC, 464 Mass. 166, 172 (2013). When the HAC hears from competing experts, "[i]t is for the agency, not the reviewing court, to weigh credibility of witnesses. Id. at 184. See Eisai, Inc. v. Housing Appeal Comm., 89 Mass. App. Ct. 604, 611 (2016).

2. Analysis. a. Nitrogen loading conditions. We begin our analysis by recognizing that the board does not dispute the HAC's determination that the conditions imposed by the board render the project uneconomic. Thus, the board has the burden to prove that "there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such conditions, and then, that such Local Concern outweighs the Housing Need." 760 Code Mass. Regs. § 56.07(2)(b)(3). Moreover, in the present case, where the town has not met the statutory minimum regarding affordable housing, there is a "rebuttable presumption that there is a substantial Housing Need

11

which outweighs Local Concerns." 760 Code Mass. Regs. § 56.07(3)(a). See Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., 464 Mass. 38, 42 (2013).

Here, the board does not contend that the project is within a nitrogen sensitive area under Title 5. Rather, the core claim is that the board presented evidence (as the HAC acknowledged in its written decision) to establish that the town has a "long-standing documented local concern in protecting its already stressed drinking water supply from nitrogen contamination, and that this concern includes the protection of potable residential wells." Indeed, the board introduced evidence that it "believed that the private wells down gradient from the proposed soil absorption system may be adversely impacted by the proposed system and protection of these wells from contamination should be afforded." The board argues that the HAC's decision to strike the entirety of condition C.5 to the comprehensive permit creates a serious health risk and was arbitrary and capricious, unsupported by substantial evidence, and an abuse of discretion.

There is a measure of persuasiveness to the board's thoughtful arguments. We have little doubt that the board presented substantial and significant evidence of a valid health, safety, or other local concern. The question, however, is whether the HAC erred or abused its discretion in concluding that the board failed to meet its burden to show that this local

12

concern outweighed the housing need, keeping in mind the rebuttable presumption noted supra.

The HAC concluded that the evidence presented by the board established only that contamination of one or more wells by excess nitrogen is a possibility, not a probability. On appeal, the board does not contend that its evidence met the preponderance standard applicable to civil cases, see Callahan v. Fleischman Co., 262 Mass. 437, 437-438 (1928), or otherwise argue that the evidence of likelihood of unacceptable levels of nitrogen reaching potable wells was equivalent to the "more likely than not" standard that we held in Reynolds, 88 Mass. App. Ct. at 349, was sufficient to outweigh the need for affordable housing. Rather, the board argues, in essence, that given the risks associated with excess nitrogen in well water, we should weigh the harms differently than the HAC did.

River Stone's expert testified that because of the characteristics of the bedrock, which is where he expected the wells to be located, the flow of groundwater would not reach the wells. While he was not certain which direction the groundwater would flow, he expected that it would travel north toward the ocean and concluded that there was no risk of nitrate in the waste reaching the wells. The HAC found that River Stone's expert "provided a clear, specific explanation of the geology of the area" as well as the "potential impact of the project," and

13

expressly found his testimony to be more credible than that of the board's expert. Our cases are clear that we may not displace the HAC's choice between experts. See, e.g., Sugarbush Meadow, LLC., 464 Mass. at 184; Zoning Bd. Of Appeals of Braintree v. 383 Washington St., LLC, 105 Mass. App. Ct. 592, 605 (2025) ("credibility determinations are the province of the HAC"). Moreover, the record demonstrates that the board was unable to quantify the risk that nitrogen would contaminate any local wells. The board bore the burden to prove that the local concern outweighs the need for affordable housing. The board simply failed to persuade the HAC that the proposed project "more probably than not" would contaminate local wells.

Further, we agree with the HAC that Reynolds does not compel a contrary result. In Reynolds, an abutter of a proposed affordable housing development introduced evidence supporting a finding that it was "'more likely than not' that the project will cause excessive nitrogen levels at the plaintiff's neighbor's well." Reynolds, 88 Mass. App. Ct. at 349. The developer in that case did not challenge that evidence and "made no effort to demonstrate that the system as planned would not result in elevated nitrogen in the groundwater reaching abutting wells." Id. That was not the case here. Rather, River Stone presented evidence through its expert that groundwater with elevated nitrogen levels would not reach the neighboring wells,

14

which led the HAC to conclude that there was "only a possibility" of such an occurrence.  Based on the evidence presented, it was not outside the range of reasonable alternatives for the HAC to conclude that the "possibility" of nitrogen contamination of nearby wells did not outweigh the need for low or moderate income housing.  We thus discern no error.

We note, however, as the board points out, that the HAC did express lingering concerns.  It said:

> The record before us leads to the finding we have made here.  Nevertheless, we believe it is important to state that even though we are not mandating mitigation by the developer, we do recommend that it consider and implement some mitigation measures that could benefit neighboring properties with wells and minimize the chances of controversy in the future.  In particular, we recommend that River Stone take either of the following actions:  (1) install an advanced nitrogen treatment facility as part of its on-site wastewater disposal system; or (2)(A) arrange and pay for annual testing of the neighboring wells for nitrogen contamination (if allowed by the respective property owner) for a period of five years from the start of occupancy of the development and provide the results of such testing to the Hingham Board of Health; and (B) if the results of testing show dangerous levels of nitrate, River Stone offer mitigation to the property owner of the potentially affected well in the form of paying the cost of connecting the property to the municipal water system.

We conclude that these comments by the HAC reflect its recognition of the serious health risks that excessive nitrogen causes and its obligation to enforce the burden placed on the board to prove that such contamination is more probable than not to occur.  Where the board did not meet its burden, the HAC would have exceeded its authority to compel River Stone to

15

comply with the conditions imposed by the board.  Yet the seriousness of the potential health impacts along with potential liability the developer might bear should excess nitrogen reach neighboring wells, an issue that is not before us, may have prompted the HAC's comments.  It's efforts to encourage the developer to take steps to ensure that excessive nitrogen does not leave the property are just that -- encouragement.  It does not take away from the HAC's application of the law to the facts before it.

b.  Density and intensity restrictions.  We have suggested that density issues "might readily call into play the anti-snobbery goals of the [Comprehensive Permit] Act."  Reynolds, 88 Mass. App. Ct. at 346.  The board's setback and road width conditions have the effect of decreasing the density of the project.  However, "[i]n cities and towns that have not met the minimum statutory threshold of affordable housing, a developer may override bulk, height, dimensional, use, and other limitations, often invoked as a pretext to exclude affordable housing."  Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 29 (2006).

Here, the HAC struck several density and intensity-related conditions that imposed various setback and spacing requirements, finding that the board failed to prove "a valid local concern that outweighs the need for affordable housing

16

sufficient to support the conditions related to the setbacks and placement of the buildings."  On appeal, much like it did before the HAC, the board generally argues that its "substantiated Local Concern is with the siting of the dwellings so close to abutting property boundaries and so close to each other, that they will substantially detract from the privacy of the existing homes and the enjoyment of light and air for the new residents." The board contends that its siting requirements are still "more permissive than allowed under existing regulations, are reasonable and necessary to ameliorate well documented Local Concerns as to both density and intensity, and are consistent with standards applied by the HAC in like developments as necessitated by the site or the surrounding area."

While the board faults the HAC for failing to conduct "a sophisticated analysis to the Board's evidence," and argues that the "question of what specific effects" the project will have on the surrounding neighborhood is important, the board itself fails to point to specific characteristics of the neighborhood and the proposed development that would render the proposed density and intensity unacceptable and cause it to outweigh the need for affordable housing.

The board claims that the HAC erred when it struck the conditions establishing setback and road width requirements. The HAC found that the town's fire marshal testified that ten

17

feet is the minimum clearance necessary to set up a ladder to reach the upper floor of one of the units, but that he also admitted that there is no local regulation that requires a ten-foot setback and that the upper levels of the particular unit are still accessible from two of the three exterior sides. As noted by the Land Court judge, imposing a condition "based on a policy existing outside of the regulatory framework" is arbitrary. Cf. Fieldstone Meadows Dev. Corp. v. Conservation Comm'n of Andover, 62 Mass. App. Ct. 265, 267-268 (2004). In these circumstances, we cannot disagree with the HAC's determination that the board failed to demonstrate a valid local concern regarding fire safety that outweighs the need for affordable housing.

Regarding the width of the internal roads, although the fire marshal testified that the width meets State codes and Hingham requirements, the board's traffic expert testified that a twenty-four foot wide roadway is recommended by the Institute of Transportation Engineers and the American Association of State Highway and Transportation Officials for medium density developments. The board contends that width of twenty-four feet enables accommodation of snow drifts or banks and unlawfully parked vehicles.

Once again, the width condition that the board imposed was not based on a State or local regulation. The HAC found that

18

parking will not be allowed on the roadways and a generous number of parking spaces is available -- 4.5 parking spaces per unit.  We agree with the HAC that the board has failed to identify a local concern that outweighs the need for affordable housing.

c.  Excluding evidence of percentage of low income.  The board contends that the HAC erred in allowing River Stone's motion to strike the board's proposed exhibit 111 -- a table showing the levels of affordable housing in Hingham as of July 30, 2020.  First, as the HAC points out in its brief, it is not clear to us that the board raised this issue before the Land Court in its motion for judgment on the pleadings, and it is therefore waived.  See Springfield v. Civil Serv. Comm'n., 469 Mass. 370, 382 (2014).  But even if we were to reach the merits, we are not persuaded.

Although River Stone's application for a comprehensive permit was submitted on March 29, 2016, the board contends that the HAC should have admitted and considered evidence of Hingham's levels of affordable housing in 2020 as relevant to its obligation to weigh the local interest against the need for affordable housing in determining whether the conditions imposed are consistent with local needs.  The board points to 760 Code Mass. Regs. § 56.07(3)(b)(3), which provides that "a stronger showing shall be required on the Local Concern side of the

19

balance where the Housing Need is relatively great than where the Housing Need is not as great."  The board contends that as to this provision, it is entitled to submit data collected after the date of the developer's application even though other sections of the regulations define "[r]ecent progress toward housing unit minimum" as "the number of SHI Eligible Housing units that have been created within the municipality during the 12 months prior to the date of the Comprehensive Permit application."  760 Code Mass. Regs. § 56.03(5) (2012).  Similarly, by regulation, calculating whether the municipality has satisfied the ten percent minimum uses the date of the application as the operative date.  See 760 Code. Mass. Regs. § 56.03(1).  To the extent the statute and regulations are silent as to the date to consider the relative need for affordable housing, it was reasonable for the HAC to apply the date of application.  See Peterborough Oil Co., v. Department of Envtl. Protection, 474 Mass. 443, 449 (2016) ("Where the [agency's] statutory interpretation is reasonable . . . the court should not supplant [the agency's] judgment" [citation omitted]).

Judgment affirmed.

By the Court (Rubin, Neyman & Tan, JJ.[5]),

*Paul Little*

---

[5] The panelists are listed in order of seniority.

20

                                        Clerk

Entered:  August 25, 2025.